RANDY S. GROSSMAN
Acting United States Attorney
DAVID CHU (CA Bar No. 242046)
VALERIE H. CHU (CA Bar No. 241709)
MARK W. PLETCHER (CO Bar No. 034615)
MICHELLE L. WASSERMAN (CA Bar No. 254686)
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, California 92101
Telephone: (619) 546-9714

Attorneys for the United States

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID NEWLAND, ET AL.,<br><br>Defendants. | No. 17-CR-00623-JLS<br>Date:      September 2, 2021<br>Time:      9:00 a.m.<br><br>**UNITED STATES'S MOTIONS IN LIMINE** |

# I

# __INTRODUCTION__

The United States makes the following motions in limine. The motions are divided into the following categories: (i) structural motions; (ii) motions to exclude evidence and argument; and (iii) motions to admit evidence. Specifically, the United States moves to:

| | Structural Motions | |
|---|---|---|
| 1. | Allow Recall of Case Agents and Limit Cross-Examination | Pg. 3 |
| 2. | Allow Presence of Case Agents and Exclude Other Fact Witnesses | Pg. 4 |
| 3. | Follow Rule 613(b) for Impeachment with Prior Inconsistent Statement | Pg. 5 |
| 4. | Follow Rule 612 for Writings Used to Refresh a Witness's Memory | Pg. 7 |
| 5. | Produce Reciprocal Discovery | Pg. 8 |
| 6. | Admit Summary Exhibits Under Rule 1006 | Pg. 8 |
| 7. | Allow Authentication Without Proving Each Link in Chain of Custody | Pg. 10 |
| 8. | Strike Portions of the Indictment for Presentment to the Jury | Pg. 10 |
| | Motions to Exclude Evidence and Argument | |
| 9. | Prohibit Evidence or Argument Aimed at Jury Nullification | Pg. 11 |
| 10. | Prohibit Evidence or Argument that Does Not Support an Actual Defense | Pg. 12 |
| 11. | Prohibit Evidence or Argument About the CIPA Litigation | Pg. 14 |
| 12. | Preclude Reference to the U.S. Navy's Deletion of Email | Pg. 15 |
| 13. | Preclude Defendant Dolan's Expert Testimony About Plea Bargaining | Pg. 17 |
| 14. | Exclude Cross-Examination on Specific Issues | Pg. 23 |
| | Motions to Admit Evidence | |
| 15. | Admit Lies and Destruction of Evidence as Consciousness of Guilt | Pg. 25 |
| 16. | Admit Expert Testimony on Specific Issues | Pg. 28 |
| 17. | Admit Lay Testimony | Pg. 33 |
| 18. | Admit Public Records | Pg. 34 |
| 19. | Admit Business Records, Foreign Business Records, and Data Copies | Pg. 35 |
| 20. | Admit the Defendants' Statements with a *Bruton* Limiting Instruction | Pg. 40 |
| 21. | Admit Rationale for the Classification of Ship Schedules | Pg. 44 |
| 22. | Admit Evidence of GDMA's and Francis's Fraud Against the U.S. Navy | Pg. 46 |
| 23. | Admit Background/Context for the Conspiracy | Pg. 49 |

17-CR-00623-JLS

## II

## STRUCTURAL MOTIONS

**1.** **Motion to Allow Recall of Case Agents in Case-in-Chief and to Limit Cross-Examination to Scope of Direct**

The United States moves the Court to allow the recall of case agents in order to present the voluminous evidence in its case-in-chief of this international, multi-year bribery conspiracy in the most efficient and streamlined manner.  Doing so will allow the orderly presentation of evidence, aid the jury's understanding of the facts, and conserve significant trial time.  For example, during portions of its case-in-chief, the United States intends to present material by topic.  For certain topics, the United States intends to call a case agent as an introductory or summary witness, followed by fact witnesses specific to the events comprising that topic.  Upon completion of the testimony on a given topic (and cross-examination thereon), the case agent witness would be excused from the stand, and then be recalled for another topic, as necessary.

The Court has the authority to allow the recall of case agents for the benefit of the presentation of evidence and the jury.  Federal Rule of Evidence 611(a) states: "The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."  Allowing the case-in-chief to proceed in this way, with the recall of case agents, would both be effective in terms of presenting the evidence and would avoid wasting time.  The alternative would be to force a case agent to testify for an extended period of time about a wide range of unrelated topics spanning years, followed by disparate fact witnesses circling back to areas of testimony covered potentially days before, thus creating a cumbersome and confusing narrative for the jury.

Courts routinely allow the recall of case agents for the benefit of the jury, especially in complicated conspiracy cases.  *See, e.g.*, Order, *United States v. Franco*, No. 12-CR-

17-CR-00623-JLS

00236-GPC (S.D. Cal. July 22, 2013) (Doc. 1233) (granting United States's motion to allow recall of case agent where RICO conspiracy case was organized by predicate acts); Order, *United States v. Villareal*, No. 08-CR-01332-JAH (S.D. Cal. May 14, 2012) (Doc. 166) (granting United States's motion to allow recall of case agent where smuggling conspiracy case was organized by smuggling event). As observed by the Eighth Circuit over forty years ago, the recall of a case agent for jury presentation "is commended as one way to clearly present an organized factual recital in an extended conspiracy trial." *United States v. Jackson*, 549 F.2d 517, 529 (8th Cir. 1977). So too here.

If the Court grants this motion to allow recall of case agents, then the scope of cross-examination of such agents would be governed by Federal Rule of Evidence 611(b). That rule limits cross-examination to the subject matter of direct examination (and to credibility). In this way, the presentation of evidence for the jury remains efficient, straightforward, and easy to understand. For example, if a case agent testifies as to official duties of U.S. Navy officers, and then is subsequently recalled to testify as to things of value received by the Defendants, the cross-examination after the latter testimony would be limited to things of value. Such limitation comports with Rule 611(b) and underscores the purposes of Rule 611(a) of effective presentation of evidence and time management. For these reasons, the Court should allow the recall of case agent witnesses.

**2.    Motion to Allow Presence of Case Agents and Exclude Other Fact Witnesses at Trial**

The United States moves the Court to allow the presence of case agents for the duration of trial, and to exclude any other fact witness (except during their respective testimony). Given the scope of the conspiracy, a number of case agents were involved with the investigation and the preparation for trial. The United States considers the case agents as integral to the trial team, and their presence during trial is critical to the orderly and efficient presentation of evidence to the jury. Unlike case agents, however, fact

4

witnesses must be excluded so that their testimony is not influenced by the testimony of others.

Under Federal Rule of Evidence 615, upon the motion of a party (or on its on motion), the Court "must order witnesses excluded so that they cannot hear other witnesses' testimony."  But the Court is not authorized to exclude: (1) a party who is a natural person; (2) the representative of a party entity; (3) "a person whose presence a party shows to be essential to presenting the party's claim or defense"; or (4) a person authorized to be present by statute.  Courts routinely allow the presence of case agents at trial.  *See, e.g.*, *United States v. Valencia-Riascos*, 696 F.3d 938, 941 (9th Cir. 2012) (affirming district court order allowing case agent at trial); *United States v. Little*, 753 F.2d 1420, 1441 (9th Cir. 1984) (citing to both Rule 615(2) and (3) in affirming presence of case agent at trial).

For fact witnesses, on the other hand, the rule mandates their exclusion on a party's motion.  *See United States v. Seschillie*, 310 F.3d 1208, 1213 (9th Cir. 2002) (observing that, under plain language of rule, exclusion of fact witnesses was a matter of right not subject to district court's discretion).  Here, the case agents should be present at trial as persons essential to the United States's presentation of evidence.  And because the United States so requests, fact witnesses should be excluded from trial except during their respective testimony.

**3.    Motion to Follow the Requirements of Rule 613(b) for Impeachment with Prior Inconsistent Statement**

The United States moves the Court to apply and enforce the requirements of Federal Rule of Evidence 613(b) for impeachment with extrinsic evidence of a prior inconsistent statement.  Rule 613(b) states:

> (b) Extrinsic Evidence of a Prior Inconsistent Statement.  Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is

17-CR-00623-JLS

given an opportunity to examine the witness about it, or if justice so requires.

This subdivision (b) does not apply to an opposing party's statement under Rule 801(d)(2).

A number of requirements flow from the rule.  First, the prior statement must be a statement made by the witness or adopted by the witness.  *See United States v. Severson*, 49 F.3d 268, 272 (7th Cir. 1995) (noting that adopted statements could be admissible as impeachment evidence).  Thus, statements of other persons not adopted by the witness are inadmissible as impeachment evidence.  Second, the prior statement must actually be inconsistent.  *United States v. Hale*, 422 U.S. 171, 176 (1975) ("A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness.  As a preliminary matter, however, the court must be persuaded that the statements are indeed inconsistent.").  Third, the witness must have the opportunity to explain or deny the prior statement.  If the witness states that he does not remember the prior statement, that answer operates as a denial.  *Williamson v. United States*, 310 F.2d 192, 199 (9th Cir. 1962).  If the prior statement is offered after the witness has already testified (i.e., through the testimony of another witness), the ability to recall the witness satisfies the foundational requirement for the opportunity to explain or deny.  *United States v. McLaughlin*, 663 F.2d 949, 953 (9th Cir. 1981).  Only then, if all of these requirements are met, the Court may admit extrinsic evidence of the prior inconsistent statement, but only for the purpose of impeachment and not as substantive evidence. *United States v. Crouch*, 731 F.2d 621, 623 (9th Cir. 1984).

By way of email dated July 10, 2020, Defendant Dolan has signaled his possible intention to engage in a confusing sideshow in an attempt to discredit government witnesses on the basis of purported "inconsistent statements."  To this end, Defendant Dolan has recently issued subpoenas to *nine* separate active and retired federal agents who participated in interviews of various potential government witnesses.  To be sure, within the reasonable bounds, a defendant has the right to admit extrinsic evidence of an

6

inconsistent statement, but to do so, the defendant must strictly meet the requirements of Rule 613(b), lest the trial devolve into a distracting and confusing trial within a trial on dueling prior inconsistent and consistent statements.

To avoid this outcome, the United States respectfully moves the Court to apply and enforce strictly the requirements of Federal Rule of Evidence 613(b).

**4.     Motion to Follow the Requirements of Rule 612 for Writings Used to Refresh a Witness's Memory**

The United States moves the Court to apply the requirements of Federal Rule of Evidence 612 on refreshing a witness's recollection.   The procedure of refreshing recollection is within the sound discretion of the Court.  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 233 (1940).  First, the witness must demonstrate that he needs to have his memory refreshed, *i.e.*, that the witness once knew but now cannot remember the fact or matter at issue.  *Thompson v. United States*, 342 F.2d 137, 139 (5th Cir. 1965).  A witness's lack of knowledge about a topic does not suffice as a failure to recall.  If a witness, in fact, cannot remember that which he once knew, counsel may then inquire if there is anything that would refresh the witness's recollection.  If so, counsel may then provide the witness with an item to refresh his recollection.  Typically, the item is a writing but may be anything that actually refreshes the recollection.  *United States v. Rappy*, 157 F.2d 964, 967 (2d Cir. 1946) ("Anything may in fact revive a memory: a song, a scent, a photograph, and allusion, even a past statement known to be false.").  The witness may then silently review the item in an effort to refresh his recollection.  Counsel then collects the item.  If the item had the effect of refreshing the witness's memory, i.e., the witness states that his recollection has, in fact, been refreshed, and that he now has an independent recollection of the fact or matter at issue, only then may the witness testify from this recollection regarding the fact or matter refreshed.  *Thompson*, 342 F.2d at 139. The witness must, however, testify from his memory and not by reading from the item used to refresh his recollection.  *Goodfriend v. United States*, 294 F. 148, 152 (9th Cir.

1923).  Under Federal Rule of Evidence 612, opposing counsel is entitled to a copy of the writing used to refresh the witness's memory, to cross-examine the witness about the writing, and to introduce in evidence those portions that relate to the witness's testimony. To avoid confusion and delay, the United States respectfully moves the Court to apply and enforce strictly the requirements of Federal Rule of Evidence 612.

**5.      Motion for Reciprocal Discovery**

The United States moves the Court to require production of reciprocal discovery from the Defendants.   When the United States made its initial productions to the respective Defendants in Spring 2017, the United States made a written reciprocal discovery request to each Defendant.   Reciprocal discovery has also been requested subsequently.

To date, the United States has not received any reciprocal discovery.  Not a single document or photograph from a single Defendant.  Nor has any Defendant communicated his intention to produce reciprocal discovery or to introduce such at trial.  Federal Rule of Criminal Procedure 16(b) requires the Defendants to produce reciprocal discovery, and Rule 26.2 requires the Defendants to produce witness statements.  Accordingly, the United States requests that Rule 16(b) material be produced by October 4, 2021, and the Rule 26.2 material be produced (on the same basis as the United States has produced Jencks Act material and interview reports in this investigation) by October 20, 2021 (consistent with the United States proposed schedule in this regard).

**6.      Motion to Admit Summary Exhibits Under Rule 1006**

The United States moves the Court to admit summary exhibits as evidence under Federal Rule of Evidence 1006.  The United States intends to offer summary exhibits, for example, as summaries of classified ship schedules that were disclosed by certain Defendants, and as summaries of the things of value that the Defendants received.

Pursuant to Rule 1006:

17-CR-00623-JLS

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation.  The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place.  The court may order that they be produced in court.

The purpose of Rule 1006 "is to allow the use of summaries when the documents are unmanageable or when the summaries would be useful to the judge and jury." *United States v. Rizk*, 660 F.3d 1125, 1130 (9th Cir. 2011).  The party offering the summary into evidence must establish that the underlying materials upon which the summary is based: (1) are admissible in evidence; and (2) were made available to the opposing party for inspection.  *Id.*  The underlying materials must be admissible but need not themselves be admitted into evidence.  *Id.*  It is the summary exhibit itself that is admitted as evidence.  *Id.*  Courts have routinely allowed summary exhibits to "help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of the multitude of witnesses."  *United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989) (allowing summary exhibit of telephone calls); *see also Rizk*, 660 F.3d at 1130 (allowing summary exhibit of real estate transactions); *Goldberg v. United States*, 789 F.2d 1341, 1343 (9th Cir. 1986) (allowing summary exhibits of tax records).

In this case, given the duration, scope, and breadth of the charged conspiracy, and the volume and complexity of the evidence, summary exhibits, which aggregate like evidence over time and geography, will substantially increase the efficiency of the trial presentation and particularly aid the jury in their understanding of the case.  Consistent with the United States proposed schedule, the United States will produce draft Rule 1006 exhibits by October 20, 2021.  In each instance, the underlying evidence is admissible and has previously been produced to the Defendants.

**7.     Motion to Allow Authentication Without Proving Each Individual Link in Chain of Custody**

The United States moves the Court to allow the authentication of evidence without proving each link in the chain of custody.  The United States seized or otherwise obtained the evidence to be presented at trial.  In many instances, that evidence is self-authenticating, such as records of regularly conducted activity, Fed. R. Evid. 902(11), or certified data copied from an electronic device, storage medium, or file, Fed. R. Evid. 902(14).

Where the evidence is not self-authenticating, the United States intends to call a case agent or other competent witness to testify regarding authenticity.  The United States is not required, however, to proffer the testimony of every person who may have come into contact with a piece of evidence in the chain of custody.  *Gallego v. United States*, 276 F.2d 914, 917 (9th Cir. 1960).  Indeed, there is a presumption of regularity in the handling of evidence by public officials.  *Id.*  Under that presumption, if this Court finds that there is a reasonable probability that the evidence has not changed in a material way since it came into the possession of the United States, the Court may admit the evidence. *Id.*  As is axiomatic, a break in the chain goes only to weight, not admissibility.  Here, given the presumption of regularity and the fact that none of the evidence to be proffered at trial has changed in any material way, this Court should allow the authentication of evidence without each link in the chain of custody.

**8.     Motion to Strike Portions of the Indictment for Presentment to the Jury**

The Court has indicated that the Indictment will be read to the jury and will go back to the jury for deliberations.  Sending the Indictment to the jury is a matter squarely within the discretion of the trial court. *United States v. Utz*, 886 F.2d 1148, 1151–52 (9th Cir. 1989) ("We perceive no reason why the district court's decision to give each juror a copy of the indictment should not be accorded the same deference due a decision of the district court to send a single copy of the indictment to the jury room."); *Shayne v. United States*,

255 F.2d 739, 743 (9th Cir. 1958); *C.I.T. Corp. v. United States*, 150 F.2d 85, 91 (9th Cir. 1945). This is particularly the case where the court cautions the jury not to consider the indictment as evidence, as this Court will here. *United States v. Steed*, 465 F.2d 1310, 1316 (9th Cir. 1972).

In its various opposition to the Defendants' motions to dismiss, the United States agreed to sever Count 11 and to refrain from arguing that certain acts were in furtherance of the conspiracy. Doc. 237 at 49 (referencing Indictment ¶¶ A216(iii), A217, and A219).

To streamline the record the United States now formally moves to strike Count 11 and ¶¶ A216(iii), A217, and A219, as well as A216(i) and A216(ii) from the Indictment. To the extent any Defendant pleads guilty prior to trial, the United States would further move to strike that Defendant's individual bribery count. The United States will prepare a redacted Indictment with the appropriate redactions for the first day of trial.

### III

### MOTIONS TO EXCLUDE EVIDENCE AND ARGUMENT

**9.  Motion to Prohibit Evidence or Argument Aimed at Jury Nullification, Including References to the Defendants' Potential Punishment, the Defendants' Need for Treatment, and the Impact of Conviction on the Defendants' Family, Employment, or Reputation**

Jury nullification "is a fact . . . not a right, either of the jury or the defendant." *United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996) ("An unreasonable jury verdict, although unreviewable if it is an acquittal, is lawless, and the defendant has no right to invite the jury to act lawlessly."). To prohibit evidence and argument aimed at jury nullification, Federal Rule of Evidence 402 provides that "[e]vidence which is not relevant is not admissible." Rule 403 provides further that even relevant evidence may be inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice." Ninth Circuit Model Jury Instruction § 3.1 explicitly instructs jurors to "not

be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy," and Instruction § 7.4 expressly prohibits the jury from considering punishment.

Applied to this case, the Court should preclude evidence and argument on the potential penalties the Defendants may face if convicted and the impact of a felony conviction on their families, employment, and reputation. *United States v. Olano*, 62 F.3d 1180, 1202 (9th Cir. 1995) (holding information about penalty and punishment draws the jury's attention away from its chief function as the sole judge of the facts, opens the door to compromised verdicts, and confuses the issues to be decided). In addition, the Defendants should be precluded from arguing that, instead of criminal convictions and prison time, they need treatment and rehabilitation for sex addiction, PTSD, or other mental impairment. Such arguments are irrelevant to guilt or innocence and unfairly prejudicial, amounting to nothing more than an impermissible call for jury nullification.

**10.    Motion to Prohibit Evidence or Argument that Does Not Support a Legally Cognizable Defense**

The Court should preclude as irrelevant any evidence or argument that does not tend to support a legally cognizable defense. It is axiomatic that if proffered evidence is insufficient as a matter of law to support a defense, the trial court should exclude that evidence. *United States v. Contento–Pachon,* 723 F.2d 691, 693 (9th Cir. 1984) (addressing duress)*; Herzog v. United States*, 226 F.2d 561, 565 (9th Cir. 1955) ("The purpose of evidence is to prove or disprove some issue in the cause on trial. If proffered evidence does not tend to do either of these things, it has no place in the trial and is either immaterial or collateral to the inquiry."); *United States v. Villegas*, 899 F.2d 1324, 1343 (2d Cir. 1990) ("Where the evidence to be presented would be insufficient as a matter of law . . . no proper interest of the defendant would be served by permitting his legally insufficient evidence to be aired at trial, and interests of judicial economy suggest that the jury should not be burdened with the matter.").

Specifically in this case, the defense should not be permitted to urge the jury to accept cultural relativism as an excuse for the Defendants' behavior. The defense may wish to present evidence or argue that bribery is not a crime, but rather "a way of life" or "how business is done" in certain foreign countries, or among certain foreign nationals. As a threshold matter, it is by no means certain that the Defendants could offer any credible support for such a notion. *United States v. McPartlin*, 595 F.2d 1321, 1343 (7th Cir. 1979) (rejecting defendant's contention that "the Brazilian payments were [neither] illegal or immoral since such payments are simply a way of doing business in Brazil," noting that the Court was "loathe to assume that surreptitious payments to governmental or private officials is a common and accepted practice in Brazil absent proof to that effect"). To the contrary, almost all of the countries in Asia are parties to the United Nations Convention against Corruption and have agreed to adopt laws criminalizing the bribery of public officials. United Nations Convention Against Corruption, Articles 15, 16, and 21 (Dec. 11, 2003) (reprinted as 43 I.L.M. 37 (2004)).[1] This includes all of the countries through which the Defendants transited and received various things of value from Leonard Francis, including Singapore, Japan, Malaysia, the Philippines, Thailand, and Vietnam.[2]

Even if the Defendants could somehow offer admissible evidence that quid pro quo bribery was the de facto, even if not de jure, way of things in Asia, it is undisputed that the Defendants -- all United States citizens -- have been charged in United States federal court, with violations of United States laws, due to their conduct as U.S. Navy officers.[3]

---

[1]     Available at United Nations website, https://www.unodc.org/documents/treaties/UNCAC/Publications/Convention/08-50026_E.pdf.

[2]     *See* https://www.unodc.org/unodc/en/corruption/ratification-status.html (listing parties).

[3]     Evidence of "cultural relativism," even of a U.S. defendant's own cultural background, that could go to his knowledge and intent, is regularly stricken. *See, e.g.*, *United States v. Hoac,* 990 F.2d 1099, 1103 (9th Cir. 1993) (affirming exclusion of testimony by expert on Chinese culture); *United States v. Rubio-Villareal*, 927 F.2d 1495,

17-CR-00623-JLS

1  Their duties and obligations do not change simply because they have crossed an ocean.[4]  It

2  is simply not a legally cognizable defense that the Defendants could freely have accepted

3  bribes because it was commonplace for foreign nationals to offer them, and  accordingly,

4  any evidence or argument on this issue must be excluded.

5       Similarly, the defense should not be permitted to minimize the crimes committed by

6  the Defendants by suggesting that sailors need to let off steam, or that "boys will be

7  boys," or that "what happens in the Seventh Fleet should stay in the Seventh Fleet" --  in

8  other words, that debauchery and prostitution are natural and harmless responses to the

9  stresses and hardships of lengthy military deployments.  As with cultural relativism, these

10  sentiments are not a legally cognizable defense to the charged crimes, and therefore

11  evidence and argument on these issues should be excluded.

12  **11.**   **Motion to Prohibit Evidence or Argument About Perceived Failures of the**

13         **CIPA Litigation**

14       It has been oft-repeated, but worth reciting yet again, that the Classified Information

15  Procedures Act governs the pretrial disclosure of classified information.  In "ad nauseum"

16  pretrial CIPA litigation, this Court has considered, and re-considered, the Defendants'

17  speculative arguments about what could have, should have, or must have been in the

18  1502 (9th Cir. 1991) (affirming exclusion of a "Mexican culture" expert to offer innocent

19  gloss on defendant's conduct); *United States v. Ruelas-Altamirano*, 463 F.2d 1197, 1198

20  (9th Cir. 1972) (affirming trial court's refusal to permit "cultural geographer" to testify

21  that Mexican people often do not know the name of their employer and that favors are

22  regularly given to and accepted by the Mexican Police from strangers," to explain away

seemingly suspicious conduct by the defendant in an illegal marijuana importation case).

[4]    *See McPartlin*, 595 F.2d at 1344 n.28 (defendant's "assertion that [bribery] is
'moral' in Brazil tempts us to examine the philosophical underpinnings of an ethical
system that varies with geographical or cultural boundaries.  Even if morality varies with
one's own culture, can it be said that an individual from a cultural and moral tradition that
condemns a practice can morally engage in that practice once he simply steps 'across the
river' into a culture with different norms? See B. Pascal, Pensees 151 (Editions Garnier
Freres 1964) ('Plaisante justice qu'une riviere borne! Verite au deca des Pyrenees; erreur
au dela.' – 'Curious justice that a river bounds! Truth on one side of the Pyrenees; error on
the other.'").

14

classified discovery. The Court carefully and meticulously considered the search protocols in this case, and reviewed the materials submitted under CIPA. Ultimately, how classified discovery was produced, and what classified discovery was produced in this case are issues of law and have been decided by the Court. Accordingly, any evidence or argument related to the pretrial CIPA litigation, including what the Defendants believe could have, should have, or must have been in the classified discovery, but that was not produced by the United States, must be excluded. Exclusion of this evidence and argument properly prevents the Defendants from committing de facto graymail before the jury by insinuating that the Defendants could be exonerated, if only the United States had produced certain classified information.

By the same token, the Defendants should be prohibited from eliciting evidence or cross-examining government witnesses on the search protocols employed to search the classified universe. In multiple hearings and dozens of pages of pleadings, the defense has had ample opportunity to advocate its position with this Court. The Court's rulings as a matter of law in this regard are final. Accordingly, the United States respectfully requests that the Court preclude evidence or argument or cross-examination of witnesses regarding the pretrial CIPA litigation, any suggestion that classified information has been withheld from the defense, that exculpatory information exists if only the United States would have looked for it (i.e., by searching for "big top," "change of command," Greenert," and "Crowder," or by seeking evidence from the Blue Ridge earlier), or that the United States has attempted to inhibit a robust defense by abusing CIPA.

## 12.     Motion to Preclude Reference to the U.S. Navy's Deletion of Email

The Defendants should also be precluded from insinuating that the U.S. Navy inappropriately deleted emails, or that emails deleted through the U.S. Navy's protocols would have exculpated or exonerated them. After four days of hearings and much briefing on these topics, the Court denied the Defendants' motions to dismiss and for a remedial jury instruction based on the Navy's deletion of emails. Doc. 343.

17-CR-00623-JLS

1   Taking into consideration the testimony presented in evidentiary hearings on July
2   15 and 16, and November 4 and 5, 2019, the Court held that the Seventh Fleet emails
3   would have been purged years before the onset of this investigation, that the agents took
4   reasonable steps to obtain and preserve evidence they believe existed, and that, in any
5   event, there was no bad faith by the prosecution team.  Doc. 343 at 8–9.  Given the
6   Court's rulings in this regard, evidence or argument condemning the U.S. Navy's routine
7   deletion of email years prior to this investigation should be excluded.

8   As a corollary matter, at the hearing the Court deferred ruling to the in limine stage
9   whether evidence of the Defendants' efforts to secure their Navy email could be permitted
10  as evidence of their intent (or lack of intent) to enter into an agreement with Francis or to
11  join the charged conspiracy.  Now that we have reached this stage, for the reasons
12  previously set forth, there is no legal or factual basis to permit even limited evidence or
13  argument regarding the Defendants' attempts to obtain their Navy emails or the U.S.
14  Navy's routine deletion of emails, and, given the Court's finding that neither the United
15  States nor the U.S. Navy did anything wrong, evidence that the U.S. Navy deleted the
16  Defendants' emails should be excluded under Rule 403 as unduly prejudicial and likely to
17  confuse or mislead the jury.

18  Simply put, there is no fact that is made more or less probable under Federal Rule
19  of Evidence 401 by any evidence that the defense attempted to obtain the Defendants'
20  emails many years later.  To begin with, acts by the Defendants' attorneys to obtain emails
21  many years after the Indictment cannot bear upon the Defendants' intent to join the
22  charged conspiracy many years before.  Even granting the most generous assumptions
23  about what the deleted emails would have shown, the suggestion that the Defendants may
24  *not* have, at certain times, and in certain circumstances, perhaps with certain less-generous
25  defense contractors or even with Francis, executed official acts uninfluenced by bribery
26  simply has no bearing on whether or not they did so with Glenn Defense Marine Asia Ltd.
27  ("GDMA") and Leonard Francis, as alleged on specific dates, in specified manners, with

28

17-CR-00623-JLS

specific co-conspirators, in the Indictment. As seems axiomatic, if the underlying evidence is not admissible, then even more so would the Defendants' efforts to obtain that evidence be inadmissible.

This sleight of hand is, ultimately, just a backdoor attempt to introduce under the guise of the Defendants' search efforts, evidence of the U.S. Navy's deletion of these emails, which the Court has excluded.[5]

**13.     Motion to Preclude Defendant Dolan's Proffered Expert Testimony Regarding Plea Bargaining for Cooperators**

By letter dated July 29, 2021, Defendant Dolan, through attorney Todd Burns, provided notice that he intends to call local defense attorney Timothy A. Scott as an expert to testify regarding "the plea negotiation process between the government and defendants who are considering cooperating, as well as the process and dynamics once such an agreement is hatched," and "benefits evident in the plea agreements of Leonard Francis and Jose Sanchez." Ex. A (Expert Notice Letter) at 1. As to those benefits, Defendant Dolan offers that Mr. Scott will testify regarding the Guidelines loss calculations that could have applied to Mr. Francis and Mr. Sanchez, the upward adjustments that could have applied, the statutory maximum for their counts of conviction compared to other statutes that could have been charged, and the financial penalties agreed to in their plea agreements. *Id.* at 3–4.

This dubious gambit has been tried previously by Mr. Burns and rejected. *See United States v. Vescuso*, 783 F. App'x 666, 668 (9th Cir. 2019) (affirming Judge

---

[5]     Should the Court disagree and permit some limited exploration of this topic, the United States would respectfully request the opportunity to respond, including by presenting testimony or argument that: the Defendants, as longtime U.S. Navy officers, certainly knew the U.S. Navy's deletion protocols and the reasons therefor, and thus would have known that efforts to obtain those email accounts years later would likely be futile; and that the United States had conducted extensive, multi-dimensional, and court-sanctioned searches to provide the Defendants discovery to which they were entitled.

Whelan's decision to reject Mr. Burns's attempt to introduce similarly described expert testimony by Timothy Scott as a waste of time and cumulative).

As in *Vescuso*, the proposed expert testimony should be excluded. *Id.* at 668. The proposed testimony would not assist the trier of fact to understand the evidence or to determine a fact at issue; the testimony is not based on reliable principles and methods; the testimony undermines this Court's role at trial as the sole arbiter of the law; and it would be misleading, confusing, and a waste of time under Federal Rule of Evidence 403.[6]

---

[6]    The United States doubts Mr. Scott's qualifications as an expert on these topics, and to the extent this Motion to Preclude is not granted, requests a *Daubert* hearing to conduct further inquiry. Defendant Dolan's notice does not establish the basis for Mr. Scott's knowledge for vast portions of the supposed expert opinions proffered in the notice letter. Some opinions seem manifestly outside his experience, for example, what "the usual process [of] the government" is when a defendant is considering cooperating, the government's choice of documents to enter, what kinds of benefits the government could offer, what the government "will always (or almost always)" do about the sentencing hearing, and how the government makes a sentencing recommendation, including his opinion that it is "based, in large part or completely, on what the government perceives as the value of the trial testimony," and more. Ex. A at 1–2. Mr. Scott's opinions make no distinction between federal and state cases, nor does he distinguish among the types of federal criminal cases (*e.g.*, guns, drugs, fraud, national security). Mr. Scott's limited perspective in this regard is likely due to the fact that he has never served as a federal or state prosecutor, never conducted a plea negotiation on behalf of the United States, never worked with a cooperator on behalf of the United States, and never formulated a sentencing recommendation on behalf of the United States. Nor has Mr. Scott established how many times as a defense attorney he has engaged in negotiations with prosecutors regarding a client who is considering cooperating, had a client who accepted a plea bargain in exchange for cooperating, or conducted a sentencing hearing at which a client's cooperation was at issue. Nor does Mr. Scott attempt to describe why negotiations related to distinct clients with disparate interests and facing vastly different potential punishments can assist the trier of fact in this case. Instead, it appears that Mr. Scott would simply be guessing about the current case. Seeking other sources for this supposed expertise, review of Mr. Scott's 703-page "Ninth Circuit Criminal Handbook," co-authored with Judge and former-AUSA Larry Burns, contains a scant 2.5 pages describing the "Prosecutor's Role in Plea Negotiations," half a page on the role of the defendant, and 4.5 pages on breach of a plea agreement. There is half a page on substantial assistance motions. Timothy A.

In *Vescuso*, Mr. Burns noticed Mr. Scott as an expert on grounds almost identical to those proffered here.   Specifically, in *Vescuso*, Mr. Burns wished to present expert testimony from Mr. Scott that: (1) the cooperator should have received adjustments for "aggravated role," "abuse of trust" and "obstruction of justice," (2) the cooperator was subject to a ten year statutory maximum sentence under the original charges, (3) the cooperator should have been required to pay restitution on the total loss amount not just

---

Scott & Larry A. Burns, Ninth Circuit Criminal Handbook, 2021 Edition §§ 9.08, 9.09, 9.12, 14.05.   (Matthew Bender).   These sections do not purport to draw from the experiences and knowledge of the authors, but simply cite and review Ninth Circuit cases.

Moreover, this proposed expert testimony is not based on reliable principles and methods.   As best as can be gleaned, the proposed testimony is based on the anecdotal professional experiences of one defense attorney, and perhaps research reviewed as part of the Handbook.   It is based on no reproducible methodology, nor is it in any manner measurable or verifiable.   Indeed, far from being reliable, the proposed testimony has the potential to mislead the jury.   For example, Defendant Dolan claims that Mr. Scott will testify that "by law the district court is required to give substantial weight to the government's assessment of the value of that testimony," and "in practice district court judges follow the government's cooperation sentencing recommendations the vast majority of the time." Ex. A at 2.   But Mr. Scott's own Ninth Circuit Handbook accurately cites controlling case law that does not require the court to give "substantial weight" at all, but assigns discretion to the sentencing court.   Specifically, the Handbook authors explain that if the government makes a motion for "substantial assistance," the court "is not bound by the sentence or sentencing range recommended by the government." Scott & Burns, Ninth Circuit Criminal Handbook, § 14.05.   The referenced cases underscore the notion that the proposed expert testimony is inaccurate.   Mr. Scott's Handbook cites *United States v. Evans-Martinez*, 611 F.3d 635, 643 (9th Cir. 2010), in which the court accepted the government's departure motion but did not impose the sentence requested by the government, and *United States v. Hanna*, 49 F.3d 572, 576 (9th Cir. 1995), in which the court denied the government's motion for downward departure, emphasizing the permissive language in the statute that the court "may" depart downward.   Scott & Burns, Ninth Circuit Criminal Handbook, § 14.05.   The Handbook explains the latter case as standing for the proposition that "[the] extent of the defendant's assistance and its impact on sentencing are matters left to the sentencing judge's discretion." *Id.*

In addition, it is difficult to discern any basis for Mr. Scott to express an expert opinion on what happens "the vast majority of the time" in district court. Ex. A at 2.   This unreliable and potentially misleading testimony should be excluded.

1   $200,000, (4) the government only makes a "substantial assistance" motion after it

2   confirms a defendant "testifies as the government anticipates," and (5) "judges are

3   required to give substantial weight to the government's recommendation with respect to

4   substantial assistance."  Answering Brief, *United States v. Vescuso*, 2018 WL 395456, at

5   *47 (9th Cir. Jan. 8, 2018).  The district court excluded this testimony, the Ninth Circuit

6   affirmed, and the Supreme Court denied certiorari.  783 F. App'x at 668, *cert. denied*, 140

7   S. Ct. 2551 (2020).  The Ninth Circuit held that because Vescuso was able to introduce the

8   general contours of the cooperator's cooperation agreement, the district court did not

9   abuse its discretion in excluding the expert's testimony, which the district court

10  determined would waste time and would be cumulative of other evidence.  *Id.*  Notably,

11  Vescuso elicited on cross-examination that the cooperator was "legally obligated" to pay

12  the full loss amount but the plea agreement required the government to recommend a

13  "lower amount of loss than actually happened," that the cooperator hoped he would be

14  "rewarded with a lower sentence based on [his] testimony," and that pursuant to his

15  cooperation agreement, he understood that the United States would "request that the judge

16  give [him] a lower sentence" if they were "satisfied" with his testimony.  Answering

17  Brief, *Vescuso*, 2018 WL 395456, at *49–50.  This cross-examination of the cooperator

18  about his actual understanding of the plea and cooperation agreement rendered the

19  proposed expert testimony by Mr. Scott cumulative and a waste of time.

20      Defendant's stated objective in calling Mr. Scott is to illuminate the purported

21  benefits cooperating witnesses received in pleading guilty and agreeing to cooperate -- in

22  other words, to suggest that these witnesses have an incentive to stretch the truth or

23  fabricate incriminating evidence against the Defendants.  But benefits offered by the

24  United States can only influence a witness if the witness appreciates them.  Thus, the

25  salient aspect of any benefit received by a cooperator is not revealed by a pedantic

26  explanation of a non-party lawyer, based on his review of plea documents or generic plea

27  and sentencing procedures in which he did not participate.  Rather, the salient aspect of the

28

17-CR-00623-JLS

plea bargain is the cooperators' subjective knowledge and understanding of such benefits. Understood in this light, nearly every paragraph of Mr. Burns's expert notice letter implicates a point that is better presented, and in most cases *exclusively* presented, as it was in *Vescuso*, through the witness's own testimony, not an expert's opinions.  The best and only way to weigh the witnesses' testimony and gauge their credibility and truthfulness in this regard is simply to ask the witnesses themselves.

As was the case in *Vescuso*, should Francis or Sanchez (or any other cooperating witness) testify, Defendant Dolan will have the opportunity to cross-examine each witness about the purported benefits in his respective Plea Agreement and Cooperation Addendum, and inquire as to whether those benefits impact his testimony.  An expert guessing about this or that adds nothing to such testimony directly from the witness.[7] *United States v. Johnson*, 297 F.3d 845, 862 (9th Cir. 2002) (finding no prejudice in excluding guidelines expert when the cooperating witnesses admitted they were "testifying in hopes of receiving a significant reduction in possible prison time," and the court gave a limiting instruction to treat their testimony with "great caution"); *United States v. Davis*, 457 F.3d 817 (8th Cir. 2006) (affirming exclusion of defense expert on the "mechanics of the federal sentencing process" when the cross-examination "sufficiently communicated to the jury the information it needed to assess the incentives government witnesses had to stretch or shade the truth in order to obtain sentence reductions").

The proposed testimony should also be excluded because it is not the type of expert testimony that would help the jury understand the evidence or determine a fact at issue.  A co-defendant's motivation for cooperating is not a subject that requires "illumination from

---

[7]     Because the value of any impeachment stems from the witness's awareness of benefits, there is no reason to go beyond the witness's subjective understanding.  In other words, Defendant Dolan is stuck with the witness's answers.  In *Vescusco*, the cooperator testified that he did not remember whether certain Guidelines enhancements were left out of his final plea agreement.  The trial court had to rebuff repeated efforts by Mr. Burns on cross-examination to inform the witness (and the jury) what those benefits were.  *See* Answering Brief, *Vescuso*, 2018 WL 395456, at *29–30.

an expert." *United States v. Castaneda*, 94 F.3d 592, 596 (9th Cir. 1996).  To the contrary, jurors are fully capable of "connect[ing] the dots and understand[ing] the implications that a plea agreement might have on a codefendant's testimony." *United States v. Allen*, 716 F.3d 98, 106 (4th Cir. 2013); *see also United States v. French*, 12 F.3d 114, 117 (8th Cir. 1993) ("[I]t is certainly within the realm of common sense that certain witnesses would have an incentive to incriminate the defendant in exchange for a lower sentence."); *United States v. Thomas*, 74 F.3d 676, 683–84 (6th Cir. 1996) ("[T]he jury could fully understand, without expert testimony, the incentive a government witness might have to lie under oath, and that therefore the proposed testimony would not be helpful to the jury here.").

Moreover, it is strictly the judge's role to instruct on the law as well as to calculate the applicable sentencing guidelines.  *United States v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999), *as amended on denial of reh'g* (Mar. 17, 1999) ("It is well settled that the judge instructs the jury in the law. . . . [I]t is the judge's duty to inform the jury about the law that is relevant to their deliberations.").  Here, the Court will instruct the jury to treat the testimony of witnesses who have received a benefit with "greater caution" than other witnesses.  Ninth Circuit Model Jury Instruction, § 4.9.  No further testimony from an expert on this topic is necessary.

Under these circumstances, the proposed expert testimony of Mr. Scott should be excluded because it would waste time and confuse and not materially assist the trier of fact, and its purpose would be better served through cross-examination and the appropriate jury instruction.  *United States v. Hicks*, 103 F.3d 837, 847 (9th Cir. 1996) (holding expert testimony may be excluded if the court "finds that the testimony would waste time, confuse or not materially assist the trier of fact, or be better served through cross-examination or a comprehensive jury instruction").

17-CR-00623-JLS

**14.    Motion to Exclude Cross-Examination**

The United States moves the Court to exclude the following areas of cross-examination as irrelevant under Federal Rule of Evidence 402, unduly prejudicial under Rule 403, and/or harassing or unduly embarrassing under Rule 611(a):

**a.    Sanchez and Flagged Images**

Jose Luis Sanchez is a co-conspirator and a cooperating witness who may testify at trial.  During the investigation, law enforcement seized a computer possessed by Sanchez.  During the electronic processing of the computer, an algorithm flagged certain images on the computer as potential child pornography.  As described in law enforcement reporting dated August 15, 2014, which was produced to the Defendants in this case, after review of the images and consultation with the National Center for Missing and Exploited Children, law enforcement concluded that the images were not, in fact, child pornography.

Accordingly, the Court should exclude any cross-examination of Sanchez regarding these flagged images.  The possession of the flagged images is irrelevant to any issue at trial.  Such possession would not be other act evidence related to an admissible purpose under Rule 404(b), nor would it be impeachment evidence because it does not bear on credibility, or under Rule 609, since there was no related conviction.  Instead, the only purpose of such cross-examination would be to unfairly prejudice, harass, or embarrass the witness as to material that was mistakenly identified by a computer search algorithm.

**b.    Francis and His Temporary Release for Medical Reasons**

On November 14, 2017, Francis made an unopposed motion for temporary release from detention for medical reasons.   Doc. 237 at 2.  The Court granted that motion based on medical necessity and ordered Francis to bear the costs of GPS monitoring, medical care, hospitalization, and private security. Doc. 237 at 18.  Francis remains on such temporary medical release, as monitored frequently by the Court.

The Defendants moved to compel the production of materials regarding Francis's temporary medical release as impeachment evidence and recently renewed that motion.

Docs. 382, 501.  The United States responded that it had conferred no benefit to Francis regarding his temporary medical release.  Doc. 394.  The Court deferred ruling on the motion because the motion was premature.  Docs. 400, 510.

This Court should exclude any cross-examination regarding Francis's temporary release for medical reasons.  To be sure, the United States must produce material impeachment information, such as any benefit it provides to a witness.  *United States v. Sedaghaty*, 728 F.3d 885, 901 (9th Cir. 2013) (reversing conviction based on prosecution's failure to disclose payments made to witness).  Likewise, a defendant has the right to cross-examine a government witness regarding a benefit conferred by the prosecution.  *United States v. Larson*, 495 F.3d 1094, 1105 (9th Cir. 2007) (ruling that precluding cross-examination regarding benefit of prosecutor's sentencing recommendation was error).  But a defendant's speculation that the United States conferred a benefit -- when the United States has represented that it has not done so -- is not impeachment material and is not a basis for cross-examination.  *United States v. Chang Da Liu*, 538 F.3d 1078, 1087 (9th Cir. 2008) (ruling that defendant's speculation that prosecution granted a witness immunity, when prosecution denied such action, was not impeachment material).  Though the Defendants speculate that someone other than Francis could be paying for his related costs, Doc. 384, that speculation is hard to square with the Court's order that Francis bear the costs.  To be clear, the United States has not paid for any of Francis's housing, security, medical treatment, or any other cost related to his temporary release.  Francis's temporary release is therefore not a benefit conferred to Francis by the United States in exchange for his cooperation and should not be the subject of cross-examination.  Rather, the temporary release is the result of this Court's order after analyzing the relevant factors, much like this Court's pretrial release orders for each Defendant.  Just as the United States has conferred no benefit to each Defendant by virtue of their respective release orders, all of which the United States did not oppose, the United

States has conferred no benefit to Francis through this Court's temporary release order based on medical exigency.

## IV

## MOTIONS TO ADMIT

**15.    Motion to Admit Lies and Destruction of Evidence as Evidence of Consciousness of Guilt as to Defendants Lausman and Loveless**

Evidence that a defendant has concealed or destroyed potentially relevant evidence is probative of whether that defendant possessed a guilty state of mind.  As the Ninth Circuit stated nearly a half-century ago, "the concealment of evidence subsequent to a commission of a crime . . . may indicate consciousness of guilt and should be placed before the trier of fact." *United States v. Brashier*, 548 F.2d 1315, 1325 (9th Cir. 1976) (allowing evidence that defendant instructed his secretary to say that she knew nothing of his business activities); *see also United States v. Castillo*, 615 F.2d 878, 885 (9th Cir. 1980) (admitting evidence that defendant directed that a potential witness be assaulted in jail); *United States v. Begay*, 673 F.3d 1038, 1046 (9th Cir. 2011) (admitting evidence that defendant told one witness to keep quiet and watch himself, and another witness to blame the murders on other people, as consciousness of guilt).

On September 16, 2013, Defendant Lausman was interviewed at his home in Hawai'i.  During that interview Lausman told the NCIS and DCIS Special Agents that GDMA had never paid for or subsidized a hotel room for him, and claimed, "I've always called ahead of time and gotten rooms under my name."  Indictment ¶ A216(i).  Later that night, after being contacted by the NCIS and DCIS Special Agents, Lausman repeatedly accessed his private email account and apparently deleted a portion of its contents.  Lausman also destroyed a hard drive that he had illegally removed from the U.S.S. George Washington that contained classified information, including documents and emails he sent and received while acting as the Commanding Officer.  Indictment ¶ A216(ii).

These are precisely the kinds of efforts that courts have determined are admissible as evidence of consciousness of guilt. *United States v. Perkins*, 937 F.2d 1397, 1401 (9th Cir. 1991) (jury was properly instructed that it could consider defendant's false statements to arresting officer as consciousness of guilt); *United States v. Boekelman*, 594 F.2d 1238, 1240 (9th Cir. 1979) (holding false exculpatory statements may be considered by jury as circumstantial evidence pointing to a consciousness of guilt); *United States v. Kuehne*, 547 F.3d 667, 692 (6th Cir. 2008) (holding proper to admit defendant's attempt to destroy photographs of himself in New York City during the time that he was alleged to have made trips to New York to exchange guns for drugs, because such tampering was probative of guilt).

The connection between these acts and the pending charges is clear and direct. The false statements occurred during the interview of Lausman by criminal investigating agents of NCIS and DCIS, who had just arrested Leonard Francis and expressly asked Lausman about GDMA and hotel accommodations provided to Lausman (and his wife) by GDMA. Lausman then appears to have deleted a portion of the contents of his personal email account and destroyed the hard drive containing emails from his time as Commander of the U.S.S. George Washington, which spanned April 2009 to September 2012. Indictment ¶ 11. During that period he sent numerous emails to Francis, including those described in the Indictment at ¶¶ A168 (asking Francis for water taxis for U.S.S. George Washington's port visit), A170, A188, A190, A192 (expressing desire to "quietly explore the possibility of new ports"), A193 (informing Francis that he was trying to get the George Washington to Singapore later in the year), A204, and A207 (emailing Francis advance notice about an unplanned port visit, and asking him to "Keep this between us only") Moreover, during his stint on the George Washington, Lausman and his wife enjoyed a stay at the Shangri-La, Singapore, paid for by Francis, Indictment ¶ A206 -- the very topic he was asked about by the NCIS and DCIS agents. Accordingly, the Court should admit this evidence as to Defendant Lausman's consciousness of guilt of bribery.

For his part, on November 5, 2013, during an interview with an NCIS Special Agent, Loveless, when asked if he had ever received "anything" of value from Leonard Francis, replied: "Never."  He also said, in that same interview, "No. I don't think so," when asked if he had ever stayed in a hotel room during his time in the U.S. Navy for which he did not pay.  Indictment ¶ A217(i),(ii).  Once again, the connection between the crime and the concealment is clear.  Francis had been arrested two months earlier -- news that reverberated among this cadre of far-flung Navy officials.  The NCIS agent was a criminal investigator asking Loveless questions explicitly about Francis.  Loveless had received prostitutes and lavish meals from Francis, as well as multiple hotel rooms for which he did not pay.  *See* Indictment ¶¶ A88 (stay at JW Marriott in Hong Kong), A103 (stay at Conrad Hotel in Bangkok), A106 (stay at Shangri-La Hotel in Singapore), A113 (stay at Shangri-La Hotel in Indonesia), A117 (stay at Shangri-La Hotel in Malaysia), A118 (stay at Shangri-La Hotel in Philippines).  Accordingly, Loveless's false statements are certainly circumstantial evidence of his consciousness of guilt of bribery.

For these reasons, the Court should admit as evidence of Defendant Lausman's consciousness of guilt of the bribery crimes charged against him (Counts 1, 7, and 13) that on September 16, 2013, Lausman lied to NCIS and DCIS agents about hotel stays from GDMA, and that on September 16 through 17, 2013, Lausman deleted a portion of the contents of his personal email account and destroyed a hard drive from the U.S.S. George Washington containing his own emails.[8]  The Court should, likewise, admit as evidence of Defendant Loveless's consciousness of guilt of the bribery crimes charged against him (Counts 1, 6, and 13) that on November 5, 2013, Loveless lied to an NCIS agent about receiving gifts from Francis and staying in hotel rooms he did not pay for.[9]  The Court

---

[8]   Defendant Lausman is charged in Count 12 with obstruction of justice for destroying this hard drive.  Thus, the evidence is admissible as substantive evidence of his intent to obstruct justice in Count 12, and as consciousness of guilt in the conspiracy and bribery crimes charged in Count 1, Count 7, and Count 13.

[9]   A review of the caselaw indicates that courts have not routinely required notice under Federal Rule of Evidence 404(b) or conducted "other acts" analysis of subsequent

should give limiting instructions explaining the limited purpose and the Defendants against whom this evidence may be considered by the jury.

**16.     Motion to Admit Expert Testimony**

The United States expects to elicit testimony from witnesses that the Court may deem to be expert testimony.  Federal Rule of Evidence 702 governs the admissibility of expert testimony and assigns to trial courts a gate-keeping function in determining the relevance and reliability of the proffered testimony.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 596–97 (1993).  This inquiry is a "flexible" one and the Court has "broad latitude" in admitting such testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–52 (1999). Pursuant to these standards, the Court should admit the following testimony:

**a.     Navy Official -- Location, Size, and Operations of the Seventh Fleet**

The United States intends to present testimony that the U.S. Navy was a branch of the U.S. Department of Defense, whose mission was to maintain, train, and equip combat-ready naval force capable of winning wars, deterring aggression, and maintaining freedom of the seas.  The U.S. Navy's Seventh Fleet was its largest numbered fleet, with 60–70 ships, 200–300 aircraft, and approximately 40,000 Sailors and Marines.  The Seventh Fleet was responsible for U.S. Navy ships and subordinate commands, which operate in the Western Pacific Ocean throughout Southeast Asia, Pacific Islands, Australia, Russia, and the Indian Ocean territories, as well ships and personnel from other U.S. Navy Fleets that enter the Seventh Fleet's area of responsibility ("AOR").  The U.S.S. Blue Ridge was the command and control ship of the Seventh Fleet and housed at-sea facilities for Seventh Fleet senior officials. The Seventh Fleet's motto was: "Ready Power for Peace."

---

acts of concealment.  As these acts have been alleged as overt acts since 2017, the Defendants would be hard-pressed to suggest that they were not on notice that the United States intended to present this evidence.  Nonetheless, to the extent required, the United States by way of the instant pleading supplies notice of its intent to introduce this evidence not as propensity evidence, but as evidence of consciousness of guilt.

1    The Seventh Fleet was under the command of a Vice Admiral, who oversaw a staff
2    of other senior U.S. Navy officers charged with running the Seventh Fleet's operations.
3    This operational staff was arrayed into Departments, each designated N1 through N9. The
4    Seventh Fleet was further divided into specialized task forces, including Task Force 70
5    (CTF 70), which, among other things, commanded all transiting surface forces in the
6    Seventh Fleet AOR, and Task Force 73 (CTF 73), comprised of the Seventh Fleet's
7    supply ship and other support vessels.

8    This witness will also describe the ranks, duties, and authority of each of the
9    Defendants during the relevant time periods, as described in Paragraphs 5–20 of the
10   Indictment.

11   This witness will testify based on knowledge, experience, training, and education.
12   A curriculum vitae of this witness and any other required disclosures related to this
13   witness's testimony will be tendered to the defense by October 4, four weeks before trial.

14   ## b.   U.S. Navy Official -- Official Duties

15   The United States will present testimony that the Defendants, as officers in the U.S.
16   Navy, had and were assigned various official duties, including, but not limited to those
17   found in the United States Navy Regulations; Department of Defense Directive ("DoDD")
18   5500.07 (Standards of Conduct), DoDD 5500.07-R (Joint Ethics Regulations), and
19   supplements thereto, including 5 C.F.R. Part 2625 (Standards of Ethical Conduct for
20   Employees of the Executive Branch), and 5 C.F.R. Part 3601 (Supplemental Standards of
21   Ethical Conduct for Employees of the Department of Defense); and Executive Order
22   12674 (Principles of Ethical Conduct). Among many others, the official duties of Officers
23   in the U.S. Navy include (1) acquainting themselves with, obeying and, so far as their
24   authority extends, enforcing the laws, regulations, and orders relating to the Department of
25   the Navy; (2) faithfully and truthfully discharging the duties of their offices to the best of
26   their ability in conformance with existing orders and regulations and their solemn
27   profession of the oath of office (Article 1130); (3) requiring themselves to show a good

28

example of virtue, honor, patriotism, and subordination; to be vigilant in inspecting the conduct of all persons who are placed under their command; to guard against and suppress all dissolute and immoral practices, and to correct, according to the laws and regulations of the U.S. Navy, all persons who are guilty of them; and to take all necessary and proper measures, under the laws, regulations and customs of the naval services, to promote and safeguard the morale, the physical well-being and the general welfare of the officers and enlisted persons under their command or charge (Article 1131); (4) reporting as soon as possible to superior authority all offenses under the Uniform Code of Military Justice ("UCMJ") which come under their observation (Article 1137); (5) complying with all directives issued by the Secretary of Defense and Secretary of the Navy regarding the Standards of Conduct and Government Ethics (Article 1110); and (6) reporting in writing any fraudulent, collusive, or improper conduct by a U.S. Navy contractor (Article 1115).

To perform their duties, the Defendants all held "Secret" or "Top Secret" clearances as a prerequisite to handling various types of classified information. Additional regulations prescribe the official duties of U.S. Navy Officers in the handling of classified information, including DoDD 5200.02r, which requires among other duties that individuals having access to classified information must promptly report to their security office: any unauthorized disclosure to any person of classified information or of other information, disclosure of which is prohibited by Statute, Executive Order, or Regulation (C2.2.1.5); the disregard of public law, Statute, Executive Order, or Regulation (C2.2.1.7); any criminal or dishonest conduct (C2.2.1.8); any acts of omission or commission that indicate poor judgment, unreliability, or untrustworthiness (C2.2.1.9); any vulnerability to coercion, influence, or pressure that may cause conduct contrary to the national interest (C2.2.1.11); and any acts of sexual misconduct or perversion indicative of moral turpitude, poor judgment, or lack of regard for the laws of society (C2.2.1.17). Co-workers shoulder an equal official duty to report when "they become

17-CR-00623-JLS

aware of information with potentially serious security significance regarding someone with access to classified information" in a sensitive position (C9.1.5).

DoDD 5240.06 prescribes the official duties of Department of Defense personnel, including the Defendants herein, related to counterintelligence awareness and reporting. In particular, DOD personnel must report certain enumerated contacts, activities, indicators, and behaviors as potential foreign intelligence entity threats against the DOD, its personnel, information, materiel, facilities, and activities or against U.S. national security. Mandatory reporting obligations inure to the following activities, among others: any improper handling or disclosure of classified information; attempts to entice co-workers into criminal situations that could lead to blackmail or extortion; attempts to entice DOD personnel into situations that could place them in a compromising position; and attempts to place DOD personnel under obligation through special treatment, favors, gifts, or money.

This witness will testify based on knowledge, experience, training, and education. A curriculum vitae of this witness and any other required disclosures related to this testimony will be tendered to the defense by October 4, four weeks before trial.

### c.    U.S. Navy Official -- Classified Information

The United States intends to present testimony related to classified information, though none of this testimony (or any evidence) will, itself, be classified. This witness will explain the definition of classified information, namely material that the United States deems to be sensitive information that must be protected. Top Secret is the highest level of classified information. Disclosure of such material would cause "exceptionally grave damage" to national security. Secret material would cause "serious damage" to national security if it were publicly available. Confidential material would cause "damage" or be prejudicial to national security if publicly available.

This witness will also testify as to the process of classifying, handling, transmitting, and destroying classified information, as well as the ramifications and consequences if

classified information is spilled or leaked or otherwise mishandled or disclosed. The witness will explain that the Secret Internet Protocol Router Network ("SIPRNet") is a system of interconnected computer networks used by the U.S. Department of Defense to transmit classified information, and that, generally, classified information must be transmitted via SIPRNet or other classified system, and not through regular military emails or private, non-government emails. The witness will also explain that information regarding the movement of U.S. Navy ships, including the information at issue in this case, is classified, and discuss the underlying rationale therefor.

This witness will testify based on knowledge, experience, training, and education. A curriculum vitae of this witness and any other required disclosures related to this testimony will be tendered to the defense by October 4, four weeks before trial.

### d.    U.S. Navy Official -- Navy Contracting

The United States will present testimony that the U.S. Navy Naval Supply Systems Command ("NAVSUP") was a command within the U.S. Navy, which was responsible for the global supply and delivery of goods and services to U.S. Navy personnel and warfighting assets. The U.S. Navy Fleet Logistics Centers ("FLC"), formerly the U.S. Navy Fleet and Industrial Supply Center ("FISC"), were subordinate commands of NAVSUP located in various domestic and foreign locations.

FLCs provided logistics support for naval installations and vessels operating in the FLC's AOR. The FLCs were responsible for soliciting, awarding, and overseeing contracts for goods and services, including ship husbanding, required by the U.S. Navy in each FLC's AOR. FLC Yokosuka supported naval installations and vessels operating in Japan, Hong Kong, South Korea, and Russia. FLC Yokosuka also oversaw the operations of a FLC Detachment in Singapore ("FLC Singapore"), which supported naval installations and vessels operating in Singapore, Malaysia, Indonesia, the Philippines, Thailand, Cambodia, Vietnam, Australia, and elsewhere.

17-CR-00623-JLS

This witness will testify as to the ship husbanding contracts at issue in this case, the award of those contracts, the underlying rationale of ship husbandry, the goods and services provided pursuant to those contracts, and more generally the mission of the U.S. Navy in the locations serviced under the contracts at issue.

This witness will testify based on knowledge, experience, training, and education. A curriculum vitae of this witness and any other required disclosures related to this testimony will be tendered to the defense by October 4, four weeks before trial.

### e.    Sommelier and Food Expert

The United States will present testimony regarding the identity, nature, origin, preparation, and value of the alcohol, food, and cigars offered and given to the Defendants by GDMA as part of this bribery scheme.  This expert will review menus, pictures, reports, invoices, and receipts of meals hosted by Francis, which the Defendants attended, and, based on the expert's knowledge and expertise in food, wine, cognac, champagne, and cigars, will testify about their identity, nature, origin, preparation, and value.  This expert's testimony will particularly assist jurors in understanding some of the food and alcohol items that may be unfamiliar to the typical juror (e.g., foie gras, Lobster Thermidor, Sendai Tenderloin, "Liberte Savage," oscetra caviar, Wagyu beef).

All of this testimony will assist jurors in understanding the lavish things of value received by the Defendants in this case as well as their monetary value.

This witness will testify based on knowledge, experience, training, and education. A curriculum vitae of this witness and any other required disclosures related to this testimony will be tendered to the defense by October 4, four weeks before trial.

### 17.    Motion to Admit Lay Testimony

In addition, the United States moves to admit lay opinion testimony.  Under Federal Rule of Evidence 701(a), a lay witness can testify as to his opinion when it is "rationally based on the witness's perceptions."  "Rationally based" entails that the lay opinion be based on the witness's personal knowledge.  *United States v. Saulter*, 60 F.3d 270, 276

(7th Cir. 1995); Fed. R. Evid. 602.  Personal knowledge upon which a lay witness's testimony rests may be "gained during the course of [the witness's] investigation." *United States v. Weaver*, 281 F.3d 228, 231 (D.C. Cir. 2002); *United States v. Freeman*, 498 F.3d 893, 904–905 (9th Cir. 2007) (permitting case agent to testify as lay witness regarding his understanding of ambiguous phrases captured in recordings, based on his direct perception of several hours of intercepted conversations and other facts learned in the investigation).

The Court should admit the testimony of investigative agents as lay witness testimony to explain and provide context for emails sent among the co-conspirators. Based on their knowledge of the investigation, agents can explain the military, ship husbanding, and conspiratorial terms and phrases used by the Defendants in emails, and the contemporaneous events and context to which the emails are referring.  *United States v. Barragan*, 871 F.3d 689, 704 (9th Cir. 2017).  To the extent the Defendants disagree with those witnesses' opinions, they are free to explore that difference of opinion during cross-examination, but such testimony will unquestionably be helpful to the "determination of a fact in issue," Fed. R. Evid. 701(b), and should therefore be admitted.

**18.    Motion to Admit Public Records Under Rule 803(8) and 902**

The United States intends to offer into evidence several types of public records, including: (1) U.S. Navy records, including contracting documents and records and personnel files relating to the Defendants, among other records; and (2) certified exchange rate records from the United States Treasury.

Certified public records are self-authenticating under Federal Rule of Evidence 902(4), and official publications are self-authenticating under Rule 902(5). The public records exception under Rule 803(8) is "a firmly rooted exception to the hearsay rule" and the admission of these public records into evidence does not violate the Confrontation Clause. *United States v. Hernandez-Herrera*, 273 F.3d 1213, 1217–18 (9th Cir. 2001) (citing *United States v. Contreras*, 63 F.3d 852, 857 (9th Cir. 1995)); *Melendez-Diaz v. Mass.*, 557 U.S. 305, 329 (2009) ("Business and public records are generally admissible

absent confrontation . . . having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial–they are not testimonial."). The public records exception is one of the few hearsay exceptions that does not require a foundation. *Hernandez-Herrera*, 273 F.3d at 1217–18. Documents that fall under the public records exception "are presumed trustworthy, placing 'the burden of establishing untrustworthiness on the opponent of the evidence.'" *Montiel v. City of Los Angeles*, 2 F.3d 335, 341 (9th Cir. 1993) (quoting *Keith v. Volpe*, 858 F.2d 467, 481 (9th Cir. 1988)).

Records kept by the U.S. Navy, including Navy contracting documents and military service records qualify as public records. *Yaich v. United States*, 283 F.2d 613, 616 (9th Cir. 1960) (finding selective service records admissible public records). Certified records of exchange rates kept by the U.S. Treasury similarly qualify as self-authenticating public records and are therefore admissible, both as certified public records as well as official publications issued by a public authority. Fed. R. Evid. 902(4), (5); Fed. R. Evid. 803(8). Accordingly, the Court should admit these and other similarly offered public records.

**19. Motion to Admit Business Records, Foreign Business Records, and Data Copied from an Electronic Device, Storage Medium, of File**

The United States respectfully requests a pretrial ruling that certified business records and certified data copied from an electronic device, storage medium, or file are authentic pursuant to Federal Rules of Evidence 803(6), 902(11), 902(14), and 18 U.S.C. § 3505. Specifically, the United States anticipates admitting certified business records from GDMA, with certifications signed by both Leonard Francis, President and CEO of Global Operations for GDMA, and Neil Peterson, Assistant Vice President of Global Operations for GDMA.

As the United States perfects its Exhibit List, the United States anticipates authenticating additional business records from GDMA and various financial institutions and hotels, as well as data copies from an electronic device, storage medium, or file,

pursuant to Rules 803(6), 902(11), 902(14), and 18 U.S.C. § 3505. These records have all been previously provided in discovery. Self-authenticating these records will greatly speed the presentation of evidence and conserve vast swaths of jury and court time.

Under Rule 803(6), "a record of an act, event, condition, opinion, or diagnosis" is not excluded by the hearsay rule, even though the declarant is unavailable as a witness if:

> (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or *by a certification that complies with Rule 902(11)* or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6) (emphasis added).

For domestic business records, Rule 902(11) provides that certified domestic records of a regularly conducted activity are self-authenticating where:

> The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification[10] of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record--and

---

[10] The United States does not intend to introduce the actual declarations into evidence at trial. *See United States v. Hagege*, 437 F.3d 943, 958 n.6 (9th Cir. 2006) (finding no Confrontation Clause violation where records certifications were not themselves admitted into evidence).

must make the record and certification available for inspection--so that the party has a fair opportunity to challenge them.

Rule 902(11) provides "that the foundation requirements of Rule 803(6) can be satisfied under certain circumstances without the expense and inconvenience of producing time-consuming foundation witnesses." Fed. R. Evid. 803, Advisory Committee's Note to 2000 Amendments; *see also DirecTV, Inc. v. Murray*, 307 F. Supp. 2d 764, 772 n.3 (D.S.C. 2004) ("Rule 902(11) was designed to work in tandem with an amendment to Rule 803(6) to allow proponents of business records to qualify them for admittance with an affidavit or similar written statement rather than live testimony."). "Thus, the most appropriate way to view Rule 902(11) is as the functional equivalent of foundation testimony offered to authenticate a business record tendered under Rule 803(6) because the declaration permitted by Rule 902(11) serves the same purpose as authenticating testimony." *United States v. Kahre*, 610 F. Supp. 2d 1261, 1263 (D. Nev. 2009).

18 U.S.C. § 3505 governs the admission of foreign business records:

[A] foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests that-- (A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters; (B) such record was kept in the course of a regularly conducted business activity; (C) the business activity made such a record as a regular practice; and (D) if such record is not the original, such record is a duplicate of the original; unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

For purposes of 18 U.S.C. § 3505, a "foreign certification" means "a written declaration made and signed in a foreign country by the custodian of a foreign record of regularly

1  conducted activity or another qualified person that, if falsely made, would subject the

2  maker to criminal penalty under the laws of that country." *Id.*

3          The admission of both domestic and foreign business records through a sworn

4  declaration of a custodian of records does not violate the Confrontation Clause.  *United*

5  *States v. Anekwu*, 695 F.3d 967, 975–77 (9th Cir. 2012) (finding that court's previous

6  holding that "a routine certification by the custodian of a domestic public record . . . and a

7  routine attestation to authority and signature . . . are not testimonial in nature" remained

8  good law, and finding that this same holding applied to foreign business records); *United*

9  *States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir. 2005)).  "The Ninth Circuit has set a low

10  bar for what constitutes 'another qualified witness'" in terms of who may fill out the

11  declaration; indeed, "[t]he phrase 'other qualified witness' is broadly interpreted to require

12  only that the witness understand the record-keeping system."  *Curley v. Wells Fargo &*

13  *Co.*, 120 F. Supp. 3d 992, 998 (N.D. Cal. 2015) (quoting *United States v. Ray*, 930 F.2d

14  1368, 1370 (9th Cir.1990)); *see also United States v. Khatallah,* 278 F. Supp. 3d 1, 6

15  (D.D.C. 2017) (finding CEO of foreign telecommunications company "another qualified

16  person" for purposes of 18 U.S.C. § 3505 because the CEO was among the founders of the

17  company, had been involved with the company for many years, and had a role in the

18  format of the company's records).

19          The notice requirement under Rule 902(11) is "intended to give the opponent of the

20  evidence a full opportunity to test the adequacy of the foundation set forth in the

21  declaration."  Fed. R. Evid. 902(11) Advisory Committee's Note to the 2000 amendments;

22  *see also United States v. Bledsoe*, 70 Fed. App'x. 370, 373 (7th Cir. 2003) ("The purpose

23  of giving notice and an opportunity to review, under Rule 902(11) is for the adverse party

24  to have the opportunity to verify, and challenge if necessary, the accuracy and reliability

25  of the records and/or certifying affidavits.").  "In other words, the burden is put on the

26  opponent of the evidence, given enough time to do so, to show that the foundation

27

28

17-CR-00623-JLS

provided by the affiant is so weak as to fail to meet the minimal standards of authenticity established by Article 9 of the Federal Rules." *DirecTV, Inc.*, 307 F. Supp. 2d at 773.

While Rule 902(11) does not establish what constitutes a fair amount of time for the notice, the time must be of such a duration that the "affidavit can be vetted for objection or impeachment in advance." *United States v. Brown*, 553 F.3d 768, 793 (5th Cir. 2008).  A party who receives notice under Rule 902(11) and fails to object to the introduction of the records prior to trial, may waive the right to the introduction at trial.  *See United States v. Olguin*, 643 F.3d 384, 391 (5th Cir. 2011) (since the United States provided written notice of its intention to introduce phone records through a declaration *five days prior to trial*, and defense counsel had previously been provided with phone records and a declaration six months before trial, there was adequate notice under Rule 902(11)); *United States v. Lewis*, 594 F.3d 1270, 1280 (10th Cir. 2010) (notice was timely under Rule 902(11) where defendant was provided notice *39 days prior to trial* and had obtained copies of the records long before trial); *Bledsoe*, 70 Fed. App'x. at 374 (since the United States provided notice under Rule 902(11) *four days before trial*, defendant was provided with "sufficient time to determine whether an objection was needed to be made or more time was needed for an adequate review").  The United States has provided the Defendants with notice of its intent to introduce business records under Rule 902(11) almost *three months* prior to trial.  Although the GDMA records were initially kept overseas, they were brought to the United States.  The United States will produce those certifications shortly after they are completed (and will continue to do so), and therefore as soon as practicable for purposes of Rule 902(11) and 18 U.S.C. § 3505.  Moreover, all of these records have long been produced in discovery, and the Defendants have had ample opportunity to review the records prior to trial.  Given their roles within the company, both Francis and Peterson are qualified to make the certification.

Finally, the United States also anticipates authenticating records under Rule 902(14).  Under Rule 902(14), "[d]ata copied from an electronic device, storage medium,

17-CR-00623-JLS

or file" is self-authenticating "if authenticated by a process of digital identification, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12)."    As the United States continues to perfect its Exhibit List, it will provide such certifications as a means to expedite the presentation of evidence and conserve jury and court time.  This evidence has long been produced to the Defendants, as have the circumstances of its acquisition in the investigation.

For these reasons, the Court should authenticate this evidence prior to trial.

## 20. Motion to Admit Defendants' Statements with a *Bruton* Limiting Instruction

The United States anticipates admitting clips from various recorded statements made by the Defendants to law enforcement, including statements made by Defendant Lausman to law enforcement on September 16, 2013; statements made by Defendant Shedd to law enforcement on September 17, 2013; statements made by Defendant Loveless to law enforcement on November 5, 2013; statements made by Defendant Dolan on December 10, 2014, March 8, 2017, and March 15, 2017; statements made by Defendant DeGuzman on March 1, 2017; statements made by Defendant Herrera on February 16, 2017; and statements made by Defendant Newland on March 2, 2017.  The United States also intends to introduce, through an agent, unrecorded statements made by Defendant Hornbeck during an interview that took place on March 7, 2017.  All of these interviews, except for Defendant Dolan's March 15, 2017 interview, took place pre-indictment and were non-custodial, and in most instances agents explicitly informed the interviewee that the interview was voluntary and/or read them their Miranda rights.[11]  *See* Ex. C (excerpt of Lausman Interview) at 5; Ex. D (excerpt of Shedd Interview) at 25–26; Ex. E (excerpt of Loveless Interview) at 4–5; Ex. F (excerpt of Dolan December 10, 2014

---

[11]    It appears that agents did not explicitly inform Defendant Newland that the interview was voluntary.  However, this interview took place at Newland's workplace during work hours in a conference room chosen by Newland, and at no point during the interview did Defendant Newland indicate that he did not want to speak to agents.  *See* Ex. B (excerpt of Newland Interview) at 2–5.

Interview) at 11–13; Ex. G (excerpt of Dolan March 8, 2017 Interview) at 9;   Ex. H (excerpt of DeGuzman Interview) at 7; Ex. I (excerpt of Herrera Interview) at 3–7; Ex. J (excerpt of Hornbeck Interview) at 1.  Before Defendant Dolan was interviewed on March 15, 2017, agents explicitly read him his Miranda rights, which he waived.  Ex. K (excerpt of Dolan March 15, 2017 Interview) at 1–2.  All of the identified statements are therefore admissible into evidence as voluntarily made.  *See* 18 U.S.C. § 3501.

The United States does not anticipate introducing any statements made by the Defendants to law enforcement in which one co-Defendant directly implicates another co-Defendant by name.  The United States does, however, anticipate introducing statements by the Defendants inculpating themselves as well as more general statements made by some of the Defendants relating to the conspiracy.  For example, during a December 10, 2014 interview Defendant Dolan had the following exchange with agents:

Q: Now did Francis know what your role was in contracting?

A: I didn't – well, he knew I wasn't –

Q. Right, yeah, but did he understand the influence you could or could not exert?

A. Yes he did.

Q. Okay.

A. He knew – I mean, unless I – unless he wanted to try to get classified schedule information or whatever which is purely criminal, for him and for me or anybody –

Ex. F at 118.

During an interview with law enforcement on March 1, 2017, Defendant DeGuzman stated, "Now I did get things from him to do that, yeah, I would say yes, because you probably already know.  Like I said, we got some gifts, maybe – I don't know where – we had a bottle of champagne, maybe that's one of the things he gave me." Ex. H at 116.  Later DeGuzman had the following exchange with agents:

41

1   AGENT: I don't want to make – I don't want to make this sound like there's
2   some kind of like, you know –
3   DEGUZMAN: Conspiracy?
4   . . .
5   AGENT: But I do think that where opportunities arose, that you guys would
6   help Leonard Francis, right?
7   DEGUZMAN: So you could say that.
8   . . .
9   AGENT: Was there an understanding that, Hey, you know Leonard is
10   helping us in these places, and he's kind of – you know, he's giving us
11   things.  And so then was there an understanding that, Hey, if we can – if we
12   can do it, to help him, we're going to do it.  Was that kind of like an
13   agreement?
14   DEGUZMAN: I would say—I would say that would be more appropriate.
15   AGENT: Okay
16   DEGUZMAN: That would be more accurate.
17   Ex. H at 119–23.

18   Under *Bruton v. United States*, 391 U.S. 123 (1968), and its progeny, "the
19   admission of a statement [to law enforcement] made by a non-testifying codefendant
20   violates the Confrontation Clause when that statement facially, expressly, or powerfully
21   implicates the defendant." *United States v. Hernandez-Orellana*, 539 F.3d 994, 1001 (9th
22   Cir. 2008).  As noted above, the United States does not intend to introduce any statement
23   that expressly implicates another Defendant.  A statement does not violate *Bruton* where it
24   only becomes incriminating when linked with evidence introduced later at trial,
25   particularly when that statement is introduced with a limiting instruction.  *Richardson v*
26   *Marsh*, 481 U.S. 200, 208 (1987); *see also United States v. Mikhel*, 889 F.3d 1003, 1044
27   (9th Cir. 2018) ("[A] statement is not facially incriminating merely because it identifies a

28

17-CR-00623-JLS

defendant; the statement must also have a sufficiently devastating or powerful inculpatory impact to be incriminatory on its face."); *United States v. Vigil,* 632 F. App'x 893, 895 (9th Cir. 2015) (finding that statements did not violate *Bruton* because they "did not facially refer to Witsoe or any other third party, and any incrimination of Vigil was merely inferential"); *United States v. Rakow*, 286 Fed. App'x 452, 454 (9th Cir. 2008) (finding no *Bruton* error where statements admitted against co-defendant "did not actually incriminate [defendant], and if they had some slight tendency to do so when coupled with other evidence, they surely did not facially, or powerfully, or expressly, or clearly do so").

Here the United States proposes that before introducing any statement made to law enforcement by a non-testifying co-Defendant, the Court give the following limiting instruction: "Ladies and Gentlemen, you are about to hear evidence that [Name] gave a statement to law enforcement.  You may consider this statement as evidence only as to [Name] and not as to any other charged defendant."  The United States therefore requests that the Court admit the Defendants' statements, with the appropriate limiting instruction.

Admission of portions of the statements by the Defendants does not entitle them to introduce other portions of those recorded statements under Federal Rule of Evidence 106. Although the United States may introduce the Defendants' statements as statements by a party opponent under Rule 801(d)(2), the Defendants' statements to law enforcement are self-serving hearsay.  A defendant cannot attempt to have "self-serving hearsay" brought before the jury without the benefit of cross-examination by the United States.  *See, e.g.*, *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988) (en banc).  Moreover, "Rule 106 does not compel admission of otherwise inadmissible hearsay evidence." *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996), as amended (Oct. 21, 1996) (internal quotations omitted).  Indeed Rule 106 only applies where the full statement serves to correct a misleading impression of a prior statement, that occurred because the statement was taken out of context.  *Id.*; *see also United States v. Meraz,* 663 F. App'x 580, 581 (9th Cir. 2016) (finding that "[t]he two excerpts the government introduced were

not misleading, and the district court correctly determined that Federal Rule of Evidence 106 did not apply"); *United States v. Smith*, 659 F. App'x 908, 914 (9th Cir. 2016) (rejecting defendant's claim that excerpts offered by United States were misleading as a whole, and finding that court properly excluded "several somewhat-exculpatory statements" because "those statements were inadmissible hearsay and Rule 106 did not require their admission"). Accordingly, the Court should admit the Defendants' statements and preclude them from attempting to introduce additional portions of those statements.

**21.  Motion to Admit Rationale for the Classification of Ship Schedules**

The United States intends to present evidence that the Defendants, both individually and collectively, provided Leonard Francis with classified ship schedules as part of the bribery conspiracy. Over the course of the conspiracy such ship schedules were provided on dozens of occasions, implicating scores of U.S. Navy ships, and hundreds of port visits across all ports in the Seventh Fleet. Passing ship schedules is an official act by a member of the U.S. Navy and doing so impermissibly was a violation of the Defendants' official duties. *See* 18 U.S.C. § 201(2)(A), (C).

During its case in chief, the United States intends to provide context for the Defendants' criminal activity by eliciting evidence of the reason why these ship schedules were classified in the first instance. Specifically, the United States anticipates that it will present evidence that the ship schedules were classified, until immediately prior to a port visit, primarily due to force protection issues, i.e., to protect U.S. Navy assets and personnel from those who might wish to cause harm and who could do so if they had advanced notice of U.S. Navy ship movements. This evidence will underscore the value of the information that the Defendants provided to Francis as a result of the stream of benefits he offered, and their knowledge of the value and sensitivity of that data. This evidence further provides necessary context for the Defendants' official duties not to disseminate this classified information and the severity of their breach of this duty. This

evidence will also counteract any argument that Francis, as the husbanding agent, would have received the ship schedules regardless. Although Francis may have become aware that certain specific U.S. Navy vessels were set to visit certain ports at a time certain prior to that visit, the Defendants in this case provided the schedules for specific ships, and at times wide swaths of the Seventh Fleet, across dozens of ships and hundreds of port visits, sometimes many months in advance. Doing so, to a foreign national, directly violated the Defendants' official duties and severely undermined the safety and security rationale of the classification of the ship schedules, which the Defendants, as Navy officers, fully understood.

Under Federal Rule of Evidence 401, evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence to the action." "Rule 401's basic standard of relevance . . . is a liberal one." *Crawford v. City of Bakersfield*, 944 F.3d 1070, 1077 (9th Cir. 2019) (internal quotations omitted); *see also United States v. Whitehead*, 200 F.3d 634, 640 (9th Cir. 2000) (noting that the standard of relevance under Rule 401 is a "minimal requirement"). Here, the rationale for the classification of the ship schedules, and the fact that all of the Defendants knew that rationale, particularly in the wake of the bombing of the U.S.S. Cole, makes it more likely that in passing those ship schedules to Francis, the Defendants were knowingly doing so in violation of their official duties. The rationale for the classification of ship schedules also underscores the value of those schedules to Francis (reinforced by the number of times he asked for them) and provides context and explanation for why he was spending so much money bribing the Defendants.

Nor would the probative value of this evidence be substantially outweighed by "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *See* Fed. R. Evid. 403. The rationale behind classification is highly probative of the Defendants' criminal intent, as well as the value of the information to Francis.

As recognized by the Ninth Circuit:

Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted as scenarios, or unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.

*United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (quoting *United States v. Mills*, 704 F.2d 1553, 1559 (11th Cir. 1983)).

Here the rationale for the classification of the ship schedules is relevant and probative of the matters before the jury, and it should therefore be admitted.

**22.   Motion to Admit Evidence of GDMA's and Leonard Francis's Fraud Against the U.S. Navy**

The United States anticipates presenting evidence of Leonard Francis's fraud against the U.S. Navy as part of the charged conspiracy and inextricably intertwined with the charged offense.  As alleged in the Indictment, during the timeframe of the bribery conspiracy, Francis, along with various other co-conspirators, including Edmond Aruffo, "participated in a scheme to defraud the U.S. Navy by overbilling on GDMA's husbanding contracts," thereby causing the U.S. Navy to sustain "losses of tens of millions of dollars."  Indictment ¶ 29.  Aruffo is alleged to have served aboard the U.S.S. Blue Ridge with various of the individuals charged in the Indictment, from 2005 through 2007.  Indictment ¶ 15.  Francis pled guilty to conspiracy to commit bribery, bribery, and conspiracy to defraud the United States. No. 13-CR-03781-JLS, Doc. 122; No. 13-CR-03782-JLS, Doc. 157; No. 13-CR-04287-JLS, Doc. 99.  Aruffo pled guilty to conspiracy to defraud the United States.  No. 14-CR-01924-BTM, Doc. 8.  The losses occasioned by

46

the U.S. Navy as a result of the fraud exceeded $35,000,000.  No. 13-CR-03781-JLS, Doc. 147.

As set forth in the Indictment, the objects of the charged conspiracy were intended to "advance GDMA's interests as questions, matters, and controversies regarding GMDA's ship husbanding business were brought to the defendants' attention." Indictment ¶ 33.  The Indictment alleges that manner and means of the conspiracy included that, in return for a stream of benefits from Francis, the Defendants "took official acts and exerted pressure on, advocated before, and provided advice to other U.S. Navy officials, knowing and intending that such advocacy and advice would form the basis for such other officials' decisions to direct ships to ports that were *more lucrative for Francis and GDMA*."  Indictment ¶ 35g (emphasis added).  The Indictment further alleges that the Defendants "took official acts and exerted pressure on, advocated before, and provided advice to other U.S. Navy officials, knowing and intending that such advocacy and advice would form the basis for such other officials' decisions to pay GDMA's claims, *overlook inflated invoices*, quash bid protests filed by GDMA's competitors, suppress competition in contract awards, and resolve in GDMA's favor other questions, matters, and controversies regarding GMDA's husbanding business."  Indictment ¶ 35j (emphasis added).  In addition, the Indictment alleges various overt acts related to billing by GDMA and Francis, including that on or about April 16, 2008, Francis emailed Defendants Dolan and Hornbeck to get them to take official acts and exert pressure on other U.S. Navy officials to get suspected fraudulent GDMA invoices paid, Indictment ¶ A99; that on or about May 5, 2008, Francis again asked Dolan and Hornbeck to intervene in a billing dispute between GDMA and the U.S. Navy, Indictment ¶ A105; that on or about September 18, 2008, Defendant Shedd used a personal email account to send an internal Navy memorandum to Francis regarding the U.S. Navy's improper payment of excessive port fees, Indictment ¶ A123, among other overt acts.

1    In short, Francis's fraud on the Navy is explicitly referred to in the Indictment
2  because it was an integral part of the conspiracy.  Therefore, because Francis's fraud is
3  evidence "of the very acts charged as crimes in the indictment" it is admissible.  *United*
4  *States v. Loftis*, 843 F.3d 1173, 1176 (9th Cir. 2016).  "In cases where the incident offered
5  is a part of the conspiracy alleged in the indictment, the evidence is admissible under Rule
6  404(b) because it is not an 'other' crime.  The evidence is offered as direct evidence of the
7  fact in issue."  *Id.*; *see also United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir. 2011)
8  ("The rule is well established that the government in a conspiracy case may submit proof
9  on the full scope of the conspiracy.").

10    Moreover, in addition to being explicitly alleged in the Indictment, Francis's fraud
11  is inextricably intertwined with the charged bribery conspiracy.  Indeed, the opportunity to
12  perpetuate his lucrative fraud scheme -- by overbilling the U.S. Navy and by attempting to
13  influence where a ship came to port, among others -- was a motivating force for Francis to
14  pay the bribes.  Francis's ability to transact with impunity was, in large part, the return on
15  his bribery investment.  As the Ninth Circuit discussed in *Loftis*, the Court has found
16  evidence deemed "other act evidence" admissible as inextricably intertwined where it
17  "constitutes a part of the transaction that serves as a basis for the criminal charge" or
18  where it is necessary to admit the evidence to "permit the prosecutor to offer a coherent
19  and comprehensible story regarding the commission of the crime."  *Loftis,* 843 F.3d at
20  1177–78.  Thus, even if the Court considered this as "other act" evidence, it is still
21  admissible because Francis's fraud constitutes an integral part of the bribery transaction
22  that serves as a basis for the criminal charge; namely, Francis bribed the Defendants in
23  part to ensure he could continue to successfully defraud and overbill the Navy.  *United*
24  *States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004) (finding evidence inextricably
25  intertwined where it "occurred within the temporal scope of the conspiracy and comprised
26  the conspiracy").

27

28

1

### 23. Motion to Admit Background/Context for the Conspiracy

2     The Court should similarly admit evidence relating to the background and context
3  of the conspiracy, including evidence relating to other co-conspirators.  The Ninth Circuit
4  has held that "the government in a conspiracy case may submit proof on the full scope of
5  the conspiracy; it is not limited in its proof to the overt acts alleged in the indictment."
6  *Rizk*, 660 F.3d at 1131; *Montgomery*, 384 F.3d at 1062; *United States v Markosian*, 637
7  Fed. App'x 286, 292 (9th Cir. 2015) (affirming admission of evidence of uncharged
8  conduct because that conduct "comprised the conspiracy" and "occurred within the
9  temporal scope of the conspiracy").    Accordingly, the Court should permit the United
10 States to introduce evidence regarding the conspiracy, including background, context, and
11 acts uncharged in the Indictment, as well as acts relating to co-conspirators not charged in
12 the Indictment.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17-CR-00623-JLS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**V**

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court grant these motions in limine.

DATED: August 12, 2021

Respectfully submitted,

RANDY S. GROSSMAN
Acting United States Attorney

/s/ David Chu
Assistant United States Attorney

/s/ Valerie H. Chu
Assistant United States Attorney

/s/ Mark W. Pletcher
Assistant United States Attorney

/s/ Michelle L. Wasserman
Assistant United States Attorney

17-CR-00623-JLS