RANDY S. GROSSMAN
Acting United States Attorney
MARK W. PLETCHER (Colorado Bar No. 034615)
MICHELLE L. WASSERMAN (California Bar No.254686)
Assistant United States Attorneys
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-9714
Email: mark.pletcher@usdoj.gov

JOSEPH BEEMSTERBOER
Acting Chief, Fraud Section
BRIAN R. YOUNG
Deputy Chief, Fraud Section
Criminal Division
Telephone: (202) 616-3114
Email:  brian.young4@usdoj.gov

Attorneys for United States of America

FILED

SEP 08 2021

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                           DEPUTY

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.  17CR0623-JLS |
|---|---|
| v. | |
| ENRICO DEGUZMAN (2), | PLEA AGREEMENT |
| Defendant. | |

IT IS HEREBY AGREED between UNITED STATES OF AMERICA, through its
counsel, and defendant, Enrico DEGUZMAN, with the advice and consent of
Hamilton Arendsen, Esq., counsel for defendant, as follows:

### I

### THE PLEA

A.   The Count of Conviction

Defendant agrees to plead guilty to Count Three, Bribery of a
Public Official, of the Indictment returned on March 10, 2017.   The
attached Restitution Addendum shall govern restitution in this case.

Plea Agreement                                    Def. Initials _____

17-CR-0623-JLS

1   If the defendant complies with his obligations pursuant to this plea
2   agreement, the United States will move to dismiss any remaining
3   additional counts at sentencing in this matter.

4       B.    Prosecution Of Additional Counts

5       In exchange for the defendant's guilty plea, the United States
6   agrees not to prosecute additional criminal charges against the
7   defendant based on information now known to the United States arising
8   out of the facts set forth in the Indictment of March 10, 2017.  Nothing
9   in this agreement, however, shields the defendant from prosecution for
10  any act or omission not now known to the United States or committed
11  after the date of this agreement.  The United States remains free to
12  prosecute the defendant for perjury or making a false statement to a
13  federal agent if the defendant commits such an offense after the
14  defendant signs this plea agreement.  Should the defendant commit
15  perjury or give a materially false statement to a federal agent, the
16  United States, at its sole discretion, will be free to prosecute the
17  defendant for that offense, move to set aside this plea agreement,
18  and/or be relieved of its obligations under this agreement.

                                    **II**
19                      **NATURE OF THE OFFENSE**

20      A.    ELEMENTS EXPLAINED

21
22      Bribery (18 U.S.C. § 201(b)(2)), the offense to which defendant is
23  pleading guilty, has the following elements:

24          1.    The defendant was a public official;

25          2.    The defendant demanded, sought, received, or accepted
26          something of value, in return for being influenced in the
27
28

Def. Initials _____
                                                                              17-CR-0623-JLS

performance of an official act, or in return for being induced to do or omit to do an act in violation of his official duty; and

3.   The defendant acted corruptly, that is, intending to be influenced in the performance of an official act, or to do or omit to do an act in violation of his official duty.

B.   ELEMENTS UNDERSTOOD AND ADMITTED – FACTUAL BASIS

Defendant has fully discussed the facts of this case with counsel. Defendant committed each of the elements of the crime and admits that there is a factual basis for this guilty plea. The following facts are true and undisputed and had this case gone to trial, the United States would have presented evidence to prove them beyond a reasonable doubt:

1.   Defendant Enrico DEGUZMAN was a Colonel in the U.S. Marine Corps, who, from July 2004 to July 2007, served on the Seventh Fleet Staff as the Fleet Marine Officer.   In this role, DEGUZMAN was responsible for coordinating the mission of the U.S. Marine Corps within the Seventh Fleet area of responsibility.   From July 2007 to January 1, 2011, DEGUZMAN served as the Assistant Chief of Staff of Operations for U.S. Marine Corps Forces, Pacific. Immediately subsequent to his active-duty service, DEGUZMAN served as the Deputy Chief of Staff of Operations for U.S. Marine Corps Forces, Pacific.   At all times, DEGUZMAN was a public official as defined by 18 U.S.C. § 201(a).

2.   Glenn Defense Marine Asia ("GDMA") was a corporation headquartered in Singapore, with operating locations in Japan, Thailand, Malaysia, Korea, Hong Kong, Indonesia, Australia, Philippines, and the United States.   GDMA's main business involved the

"husbanding" of marine vessels, a service it had provided across the Seventh Fleet's area of responsibility under various contracts with the U.S. Navy for over 25 years. "Ship husbanding" involves the coordinating, scheduling, and direct and indirect procurement of items and services required by ships and submarines when those vessels arrive at port. Examples of these items and services included, among others, tugboats; fenders; port authority or customs fees; security; food; fuel; water; trash removal; collection, holding, and transfer of liquid waste ("CHT"); and transportation, among many others.

3.    Leonard Glenn Francis, charged elsewhere, was a citizen of Malaysia, and was the owner, President and CEO of GDMA.

4.    As charged in the Indictment of March 17, 2017, from in or about February 2006 and continuing through September 17, 2013, Enrico DEGUZMAN, a public official, directly and indirectly, corruptly sought, received, and accepted things of value, including meals, entertainment, travel and hotel expenses, and gifts, among others items, in return for being influenced in the performance of official acts and being induced to do and omit to do acts in violation of his official duties.

5.    In one particular, in return for these things of value from Francis, defendant was induced to do and omit to do acts in violation of his official duties, including those arising from his top secret security clearance, and those related to foreign intelligence threats; specifically, inter alia, receiving and failing to report others' receipt of things of value from Francis, a defense contractor and a prohibited source; engaging in and failing to report violations of the

Uniform Code of Military Justice; and failing to report fraudulent and improper conduct by Francis, a U.S. Navy contractor.

6.    On or about February 16, 2006, the Seventh Fleet Judge Advocate General circulated an ethics message to all senior officers of the Seventh Fleet, including DEGUZMAN, advising them as to the ethics regulations pertinent to receiving gifts in foreign ports, including those regulations specific to receiving gifts from a defense contractor.

7.    Notwithstanding the clear guidance from the Seventh Fleet JAG, the next day, on or about February 17, 2006, during the U.S.S. Blue Ridge's port visit to Hong Kong, DEGUZMAN and others dined and drank at Francis's expense at the Petrus Restaurant in Hong Kong at a cost to Francis of $20,435.00. While in Hong Kong, DEGUZMAN also stayed at the Shangri-La Hotel paid for, in part, by Francis. To conceal and cover up their corrupt relationship, Francis created fraudulent receipts for the Petrus dinner in an amount that DEGUZMAN knew was a small fraction of the actual cost of the dinner.

8.    On or about March 9, 2006, during the U.S.S. Blue Ridge's port visit to Singapore, DEGUZMAN and others dined with Francis at the Jaan Restaurant in Singapore. Prior to dinner, DEGUZMAN and others enjoyed pre-dinner entertainment on the exclusive helipad on the roof. At dinner, defendant and others enjoyed foie gras terrine, duck leg confit, ox-tail soup, and roasted Chilean sea bass, paired with expensive wine and champagne, followed by digestifs and cigars. The estimated cost to Francis of this dinner was $40,000.

9.   On or about September 9, 2006, DEGUZMAN, and others dined with Francis at Francis's expense at the New York Grill in Tokyo, Japan, and stayed at Francis's expense at the Park Hyatt Hotel, at a total cost to Francis of approximately $30,000.

10.   On or about January 2, 2007, DEGUZMAN emailed Francis, noting that he "just spoke to [DN] re [a Hong Kong ship husbanding issue]. I think that he will speak to the right people once he gets a few more info tidbits. I passed all the info you told me re the terminal."

11.   During the U.S.S. Blue Ridge's port visit to Singapore from about February 22-27, 2007, Francis paid for the hotel expenses for DEGUZMAN and others at the Shangri-La Hotel, Singapore at a total cost to Francis of approximately $50,000. As part of this port visit, DEGUZMAN and others dined with Francis at Francis's expense on multiple occasions, including at the Blu Restaurant within the Shangri-La Hotel, and at the Jaan Restaurant atop the Shangri-La Hotel.

12.   On or about March 1, 2007, DEGUZMAN forwarded to Francis a proprietary, internal U.S. Government email in which a State Department official complained about an incident involving GDMA personnel during the U.S.S. Blue Ridge's port visit to General Santos City, Philippines. In the body of the email, DEGUZMAN advised Francis: "Recommend some quick damage control the Glenn Marine way to minimize." In a separate email of March 1, DEGUZMAN advocated to many U.S. officials in defense of GDMA, laying blame instead with local Filipino personnel.

13.   Starting the same day, from on or about March 1-5, 2007, incident to a port visit by the U.S.S. Blue Ridge to Kuala Lumpur,

Malaysia, Francis paid for hotel rooms at the Shangri-La Kuala Lumpur for DEGUZMAN and others, although DEGUZMAN was unable to make use of his room due to intervening U.S. Navy obligations.

14. On or about March 6, 2007, Francis sent DEGUZMAN an email complaining about the Military Sealift Command using a GDMA competitor as a husbanding agent. DEGUZMAN responded: "[C]opy. Like I said, [Seventh Fleet Officer] is going to try to fix it later but for now have to play nice w/ [a competitor in the Philippines]."

15. On or about March 24, 2007, DEGUZMAN and others attended a multi-course dinner hosted by Francis at the Oak Door in Tokyo, Japan, during which was served, at Francis's expense, foie gras, Lobster Thermidor, and Sendai Tenderloin, and for dessert, "Liberté Sauvage," the winning cake of the 10th Coupe du Monde de la Patisserie 2007, followed by cognac and cigars. During the event, the attendees posed for a photograph wearing custom-made GDMA neckties.

16. On April 5-7, 2007 DEGUZMAN and his wife stayed at the Makati Shangri-La, traveling from there to Cebu, Philippines, where they stayed from April 8-11, 2007 at the Shangri-La Mactan Resort and Spa, all at Francis's expense. On or about April 7, 2007, DEGUZMAN emailed Francis to advise that DEGUZMAN paid for his room: "FYI, I paid the Makati Shangri-La (P$37,194) for the room here. I just wanted to make sure that Glenn Marine did not get charged for it." "The info you sent me re competitor in the Philippines] is very interesting. I'll make sure it gets to some interested folks." Francis responded, "[T]here was oversight by the Staff of the Makati Shangri-La for charging your credit

card. They have assured me that it will be reversed and credited back into your card account." The charges to DEGUZMAN's credit card were, in fact, reversed, and the hotel room at the Makati Shangri-La was subsequently paid for by Francis. Francis assured DEGUZMAN, "The room at the [M]actan Shangri-La is confirmed and you won't have any issues for payment there." Francis continued: "[A]nything you can do to bury [the GDMA competitor in the Philippines] with the [i]ntel I provided would be appreciated." On or about April 17, 2007, DEGUZMAN confirmed with Francis that he had passed the information about the GDMA competitor in the Philippines on to NCIS, noting, "they know about it as well as the alleged excessive charges against the Navy."

17.   On or about April 19, 2007, Francis emailed DEGUZMAN: "On another note it seems SUBGRU7 [Submarine Group 7] is considering sending one of their assets to Subic [Bay, Philippines]. [B]ad Idea. Send it somewhere but Subic please." DEGUZMAN responded, "I think if we come up w/an alternative, we can get SUBGRU to buy off on it."

18.   On or about April 22, 2007, DEGUZMAN again emailed Francis to assure him: "Copy all your past email re FISC and Subic. We'll find alternatives until 'Leonard's World' is fixed."

19.   During the course of the conspiracy, DEGUZMAN routinely assisted Francis with evaluating and indoctrinating potential new U.S. Navy members into the conspiracy, including spearheading a "shaping op" aimed at the Commanding Officer, AB, at FISC Yokosuka.

20.   On or about May 29, 2007, Francis forwarded to DEGUZMAN several "bravo zulu" letters prepared for the signature of senior U.S.

Navy officers. DEGUZMAN responded: "Got them and will start working on the right signatures." Francis replied, offering DEGUZMAN and others a hotel room during an upcoming port visit to Hong Kong: "Copy all on the letters.  Can I propose the Shangri-La or the Peninsula [in Hong Kong]."

21.  On or about June 5, 2007, DEGUZMAN sent Francis internal U.S. Navy correspondence regarding the U.S.S. Peleliu, forwarding the communication from his official U.S. Navy email account to his personal email account and then on to Francis.

22.  On or about June 14-18, 2007, during the U.S.S. Blue Ridge's port visit to Sydney, Australia, DEGUZMAN and others stayed at the Shangri-La Hotel in Sydney, Australia at a total cost to Francis of over $10,000 USD. During this port visit, Francis hosted and paid for a farewell and "changing of the guard" dinner event at the Altitude Restaurant within the Shangri-La Hotel. DEGUZMAN and others dined on sauté of scallops, foie gras, and beef loin.  All the participants signed an Altitude menu dated June 17, 2007 reflecting their attendance. The total cost of this dinner was approximately $11,898 AUD. During dinner, [RG] handed Francis computer disks containing classified port visit information for many U.S. Navy ships.

23.  On or about July 2, 2007, DEGUZMAN departed the Seventh Fleet to assume his new position as Assistant Chief of Staff of Operations for U.S. Marine Corps Forces, Pacific, at Camp H.M. Smith, Hawaii.

24.  On or about July 3, 2007, DN sent Francis an email stating, "[JC] just left for 2 weeks leave before he meets the ship in Yoko[suka] and turns over with [JD].  [DEGUZMAN] just left yesterday. I leave the

morning of 9 July. [DH] is back, so use him as your main POC until we figure out how [the incoming COS] will respond."

25.  On or about July 7, 2007, DEGUZMAN emailed Francis: "I know FISC owes you for the liberty ferry and everything else especially in India. ... [U]nfortunately, I don't think I'll be able to influence people [from Camp Smith] like I did there at 7th Fleet."

26.  From in or about October 2008 through at least June 2009, in a long-running series of email and attachments, DEGUZMAN actively solicited post-retirement employment with GDMA.

27.  In an effort to demonstrate his value to GDMA (in violation of his official duties as a U.S. Marine Corps Officer), on June 29, 2009, DEGUZMAN sent Francis an email requesting "any info you have on your nemesis [a competitor in the Philippines] to determine what kind of fraud, waste, and abuse we can use." On July 1, 2009, Francis sent DEGUZMAN a mug shot and rap sheet of the CEO of this competitor.

28.  The value of the items DEGUZMAN personally received from GDMA pursuant to this relationship was at least $67,054.94.

29.  As a Colonel in the U.S. Marine Corps, DEGUZMAN was a public official in a high-ranking, decision-making and sensitive position.

### III

### PENALTIES

Bribery (18 U.S.C. § 201), the offense to which defendant is pleading guilty, carries the following penalties:

       a.  A maximum 15 years in prison;

       b.  A maximum $250,000 fine;

c.   A mandatory special assessment of $100;

d.   A term of supervised release of up to three years.

Failure to comply with any condition of supervised release may result in revocation of supervised release, requiring defendant to serve in prison, upon revocation, all or part of the statutory maximum term of supervised release.

In addition, defendant shall be subject to an order of restitution to the U.S. Navy, requiring defendant to repay $67,054.94.

## IV

### DEFENDANT'S WAIVER OF TRIAL RIGHTS AND UNDERSTANDING OF CONSEQUENCES

This guilty plea waives defendant's rights at trial, including:

A.   To continue to plead not guilty and require the United States to prove the elements of the crimes beyond a reasonable doubt;

B.   To a speedy and public trial by jury;

C.   To the assistance of counsel at all stages;

D.   To confront and cross-examine adverse witnesses;

E.   To testify and present evidence and to have witnesses testify on behalf of defendant;

F.   Not to testify or have any adverse inferences drawn from the failure to testify;

G.   Defendant knowingly and voluntarily waives any rights and defenses defendant may have under the Excessive Fines Clause of the Eighth Amendment to the United States Constitution to the forfeiture of property in this proceeding or any related civil proceeding.

H. To assert now or on appeal, any legal, constitutional, statutory, regulatory, and procedural rights and defenses

Plea Agreement

11

Def. Initials _____

17-CR-0623-JLS

that he may have under any source of federal or common law, including among others, challenges to personal jurisdiction, extraterritoriality, statute of limitations, venue, and the form and substance of the Indictment, including specifically any claim of multiplicity or duplicity.

**V**

**DEFENDANT ACKNOWLEDGES NO PRETRIAL RIGHT TO BE PROVIDED WITH IMPEACHMENT AND AFFIRMATIVE DEFENSE INFORMATION**

Any information establishing the factual innocence of defendant known to the undersigned prosecutor in this case has been turned over to defendant. The United States will continue to provide such information establishing the factual innocence of defendant.

If this case proceeded to trial, the United States would be required to provide impeachment information for its witnesses. In addition, if defendant raised an affirmative defense, the United States would be required to provide information in its possession that supports such a defense. By pleading guilty, defendant will not be provided this information, if any, and defendant waives any right to this information. Defendant will not attempt to withdraw the guilty plea or to file a collateral attack based on the existence of this information.

**VI**

**DEFENDANT'S REPRESENTATION THAT HIS GUILTY PLEA IS KNOWING AND VOLUNTARY**

Defendant represents that:

A.    Defendant has had a full opportunity to discuss all the facts and circumstances of this case with defense counsel and has a clear understanding of the charges and the consequences of this plea. By pleading guilty, defendant may be giving up, and rendered ineligible to receive, valuable government benefits and civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. The conviction in this case may

subject defendant to various collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case; debarment from government contracting; and suspension or revocation of a professional license, none of which can serve as grounds to withdraw defendant's guilty plea.

B.  No one has made any promises or offered any rewards in return for this guilty plea, other than those contained in this agreement or otherwise disclosed to the Court.

C.  No one has threatened defendant or defendant's family to induce this guilty plea.

D.  Defendant is pleading guilty because defendant is guilty and for no other reason.

## VII

### AGREEMENT LIMITED TO U.S. ATTORNEY'S OFFICE SOUTHERN DISTRICT OF CALIFORNIA

This plea agreement is limited to the U.S. Attorney's Office for the Southern District of California and the Criminal Division, Fraud Section, and cannot and does not bind any other authorities in any type of matter, although the United States will bring this plea agreement to the attention of other authorities if requested by defendant.

## VIII

### APPLICABILITY OF SENTENCING GUIDELINES

The sentence imposed will be based on the factors set forth in 18 U.S.C. § 3553(a). In imposing the sentence, the sentencing judge must consult the United States Sentencing Guidelines ("Guidelines") and take them into account. Defendant has discussed the Guidelines with defense counsel and understands that the Guidelines are only advisory, not mandatory. The Court may impose a sentence more severe or less severe than otherwise applicable under the Guidelines, up to the maximum in the statute of conviction. The sentence cannot be determined until a presentence report is prepared by the U.S. Probation Office and defense

1  counsel  and  the  United  States  have  an  opportunity  to  review  and

2  challenge the presentence report. Nothing in this plea agreement limits

3  the duty of the United States to provide complete and accurate facts to

4  the district court and the U.S. Probation Office.

5                                    IX

6              **SENTENCE IS WITHIN SOLE DISCRETION OF JUDGE**

7       This plea agreement is made pursuant to Federal Rule of Criminal

8  Procedure  11(c)(1)(B).  The  sentence  is  within  the  sole  discretion  of

9  the  sentencing  judge  who  may  impose  the  maximum  sentence  provided  by

10  statutes  of  conviction.  It  is  uncertain  at  this  time  what  defendant's

11  sentence will be. The United States has not made and will not make any

12  representation about what sentence defendant will receive. Any estimate

13  of the probable sentence by defense counsel is not a promise and is not

14  binding  on  the  Court.   Any  recommendation  by  the  United  States  at

15  sentencing also is not binding on the Court. If the sentencing judge

16  does  not  follow  any  of  the  parties'  sentencing  recommendations,

17  defendant will not withdraw his plea of guilty.

18                                    X

19              **PARTIES' SENTENCING RECOMMENDATIONS**

20       A.   SENTENCING GUIDELINE CALCULATIONS

21       Although the Guidelines are only advisory and just one factor the

22  Court will consider under 18 U.S.C. § 3553(a) in imposing a sentence,

23  the parties will jointly recommend the following Base Offense Level,

24  Specific Offense Characteristics, Adjustments, and Departures:

25

26                    Base Offense Level
                     [USSG § 2C1.1(a)(1)]                          14

27

28

```
Special Offense Characteristics –

More Than One Bribe
[USSG § 2C1.1(b)(1)]                                  + 2

Value of Things Obtained by Defendant
[USSG §§ 2C1.1(b)(2) and 2B1.1(b)(1)(D)]             + 6

High-Level Decision-making and Sensitive Position
[USSG § 2C1.1(b)(3)]                                  + 4

Acceptance of Responsibility
[USSG § 3E1.1]                                        – 3

Combination of Circumstances
[USSG § 5K2.0]                                        – 2
```

**Resulting Adjusted Offense Level              21**

B.    ACCEPTANCE OF RESPONSIBILITY

Notwithstanding Paragraph A above, the United States need not recommend an adjustment for Acceptance of Responsibility if defendant engages in conduct inconsistent with acceptance of responsibility including, but not limited to, the following:

    1.    Failing to truthfully admit a complete factual basis as stated in the plea at the time the plea is entered, or falsely denying, or making a statement inconsistent with, the factual basis set forth in this agreement;

    2.    Falsely denying prior criminal conduct or convictions;

    3.    Being untruthful with the United States, the Court or United States Probation Office; or

    4.    Breaching this plea agreement in any way.

C.    FURTHER ADJUSTMENTS AND SENTENCE REDUCTIONS
    INCLUDING THOSE UNDER 18 U.S.C. § 3553

The parties agree that the parties will not request or recommend additional upward or downward adjustments and departures, including criminal history departures under USSG § 4A1.3, pursuant to the United States Sentencing Guidelines.    Defendant may, however, request or

Plea Agreement                          15                  Def. Initials

17-CR-0623-JLS

1  recommend a sentencing variance pursuant to 18 U.S.C. § 3553(a), and
2  the United States may oppose any such request for a variance.

3      D.   NO AGREEMENT AS TO CRIMINAL HISTORY CATEGORY

4      The parties have **no** agreement as to defendant's criminal history.

5      E.   "FACTUAL BASIS" AND "RELEVANT CONDUCT" INFORMATION

6      The defendant agrees that the facts in the "factual basis"
7  paragraph of this plea agreement are true and may be considered as
8  "relevant conduct" under USSG § 1B1.3 and as the nature and
9  circumstances of the offense under 18 U.S.C. § 3553(a)(1).

10     F.   PARTIES' RECOMMENDATIONS REGARDING CUSTODY

11     The parties agree that the United States will recommend that the
12 defendant be sentenced within the advisory guideline range as calculated
13 by the United States at the time of sentencing.

14     G.   SPECIAL ASSESSMENT/FINE/RESTITUTION/FORFEITURE

15         1.   Special Assessment

16     The parties will jointly recommend that defendant pay a special
17 assessment in the amount of $100.00 per felony count of conviction.
18 Special assessments shall be paid through the office of the Clerk of
19 the District Court by bank or cashier's check or money order made
20 payable to the "Clerk, United States District Court."

21         2.   Fine

22     The parties agree to jointly recommend that defendant be sentenced
23 to pay a fine in the amount of $37,500.  Any payment schedule for a
24 fine imposed by the Court establishes only a minimum obligation.
25 Defendant will make a good faith effort to pay any fine. Regardless of
26 defendant's compliance, imposition of a payment schedule does not limit

27
28

the ability of the United States to collect additional amounts from defendant through all available collection remedies, at any time.

H.   UNDERLINE SUPERVISED RELEASE

The parties agree to jointly recommend a 36-month period of supervised release, during which time, in addition to any other conditions imposed, defendant will complete 150 hours of community service under the supervision of the U.S. Probation Office. Defendant will not seek to reduce or terminate the term of supervised release until defendant has served at least 1/2 of the term of supervised release and has fully completed his community service obligations and paid and satisfied any special assessments, fine, criminal forfeiture judgment, and restitution judgment.

XI

**DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK**

Defendant knowingly and voluntarily waives (gives up), any and all rights to appeal and to collaterally attack every aspect of the conviction and sentence, including any restitution order, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel. If the defendant appeals, the United States may oppose the appeal on any available grounds.

XII

**BREACH OF THE PLEA AGREEMENT**

Defendant and defendant's attorney know the terms of this agreement and shall raise, before the sentencing hearing is complete, any claim that the United States has not complied with this agreement. Otherwise, such claims shall be waived (that is, deliberately not raised despite

Plea Agreement                    17

Def. Initials _____
17-CR-0623-JLS

awareness that the claim could be raised), cannot later be made to any court, and if later made, shall constitute a breach of this agreement.

Defendant further breaches this agreement if defendant violates or fails to perform any obligation under this agreement. The following are non-exhaustive examples of acts constituting a breach:

1. Failing to plead guilty pursuant to this agreement;
2. Failing to fully accept responsibility as established in Section X, Paragraph B, above;
3. Failing to appear in court;
4. Attempting to withdraw the plea;
5. Failing to abide by any court order related to this case;
6. Appealing (which occurs if a notice of appeal is filed) or collaterally attacking the conviction or sentence in violation of Section XI of this plea agreement; or
7. Engaging in additional criminal conduct from the time of arraignment until the time of sentencing.

If defendant breaches this plea agreement, defendant will not be able to enforce any provisions, and the United States will be relieved of all of its obligations under this plea agreement. For example, the United States may proceed to sentencing but recommend a different sentence than what it agreed to recommend above. Or, the United States may pursue any charges including those that were dismissed, promised to be dismissed, or not filed as a result of this agreement. Defendant agrees that the statute of limitations relating to such charges is tolled indefinitely as of the date all parties signed this agreement, and defendant waives any double jeopardy defense to such charges). The United States may further move to set aside defendant's guilty plea.

1  Defendant may not withdraw the guilty plea based on the pursuit of the
2  United States of any or all remedies for defendant's breach.

3      Additionally, if defendant breaches this plea agreement: (i) any
4  statements made by defendant, under oath, at the guilty plea hearing
5  (before either a Magistrate Judge or a District Judge); (ii) the factual
6  basis statement in Section II.B in this agreement; and (iii) any
7  evidence derived from such statements, will be admissible against
8  defendant in any prosecution of, or any action against, defendant. This
9  includes the prosecution of the charge that is the subject of this plea
10 agreement and any charges that the prosecution agreed to dismiss or not
11 file as part of this agreement, but later pursues because of a breach
12 of this plea agreement by the defendant. Additionally, defendant
13 knowingly, voluntarily, and intelligently waives any argument that the
14 statements and any evidence derived from the statements should be
15 suppressed, cannot be used by the United States in any prosecution of,
16 or any action against, defendant, or are inadmissible under the United
17 States Constitution, any statute, Rule 410 of the Federal Rules of
18 Evidence, Fed. R. Crim. P. 11(f), and any other federal rule.

19 <center>**XIII**</center>

20 <center>**CONTENTS AND MODIFICATION OF AGREEMENT**</center>

21     This plea agreement and the incorporated addenda embodies the
22 entire agreement between the parties and supersedes any other agreement,
23 written or oral. No modification of this plea agreement shall be
24 effective unless in writing signed by all parties.

25

26

27

28

Plea Agreement             19              Def. Initials

17-CR-0623-JLS

1

## XIV

2

### DEFENDANT AND COUNSEL FULLY UNDERSTAND AGREEMENT

3    By signing this agreement, defendant certifies that defendant has
4 read it or that it has been read to defendant in his native language.
5 Defendant has discussed the terms of this agreement with defense counsel
6 and fully understands its meaning and effect.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## XV

2

### DEFENDANT SATISFIED WITH COUNSEL

3      Defendant has consulted with counsel and is satisfied with

4 counsel's representation.  This is defendant's independent opinion, and

5 his counsel did not advise defendant about what to say in this regard.

6

7

8                                      Randy S. Grossman
                                       Acting United States Attorney
9

10 __09.03.2021__
   DATED                               _____
11                                     Mark W. Pletcher
                                       Michelle L. Wasserman
12                                     Assistant U.S. Attorneys

13                                     Joseph Beemsterboer
                                       Acting Chief, Fraud Section
14

15 __09.03.2021__                      __BRIAN R YANG/__
   DATED                               Brian R. Young  MWD
16                                     Deputy Chief, Fraud Section

17

18 __8/3/21__                          _____
   DATED
19                                     Hamilton Arendsen, Esq.
                                       Counsel for the Defendant

20

21 **IN ADDITION TO THE FOREGOING PROVISIONS TO WHICH I AGREE, I SWEAR UNDER**
   **PENALTY OF PERJURY THAT THE FACTS IN THE "FACTUAL BASIS" ARE TRUE.**
22

23 __3 Aug 21__                        _____
   DATED
24                                     Enrico DeGUZMAN
                                       Defendant
25

26

27

28

                                21